Opinion issued December 16, 2004










In The
Court of Appeals
For The
First District of Texas




NO. 01-03-00177-CR




CLARA HARRIS, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 177th District Court
Harris County, Texas
Trial Court Cause No. 918964




O P I N I O N
          A jury found appellant, Clara Harris, guilty of murder, found in one special
issue that appellant caused the death under the immediate influence of sudden passion
arising from an adequate cause, and assessed punishment at confinement for 20 years
and a $10,000 fine. In seven points of error, appellant challenges the trial court’s
rulings excluding two videotapes from evidence, disallowing the impeachment of a
witness, refusing to give an instruction on reckless driving, and denying appellant’s
request to make the opening and closing arguments at the punishment phase of the
trial. We affirm. 
                                                   BACKGROUND
The Incident 
          On July 24, 2002, appellant was notified by a private investigator, whom
appellant had hired, that her husband, the complainant David Harris, and Gail Bridges
had checked into the Nassau Bay Hilton Hotel. Shortly thereafter, appellant and her
step-daughter, Lindsey Harris, drove to the hotel. The person at the front desk told
them that neither David Harris nor Bridges was registered with the hotel. Appellant
and Lindsey walked to the parking lot and found Bridges’s Navigator. Appellant
scratched the Navigator with a key, ripped the rear-window wiper off and bent the
front window wipers. Appellant and Lindsey each called the complainant on his cell
phone and told him that one of his children was ill. They waited near the hotel
entrance until they saw the complainant and Bridges leave a hotel elevator holding
hands. Appellant confronted Bridges and a struggle ensued in the hotel lobby
between the two women. Hotel employees broke up the fight and escorted the parties
to their vehicles. 
          After getting into her car, a Mercedes S430, appellant, with Lindsey in the
passenger seat, backed out and then accelerated, squealing her tires, and proceeded
to the back parking lot area where the complainant’s and Bridges’ cars were parked. 
Appellant drove toward Bridges’ Navigator, approaching the rear of the Navigator
from the passenger side, and then made a right turn into the open parking space next
to the Navigator on the driver’s side. Appellant’s car struck the side of the Navigator
at the rear and damaged the right side of appellant’s car. The driver’s door of the
Navigator was open, and Bridges was standing inside the door. The complainant was
standing to the left of the door in the empty parking space, although his exact location
is unknown, and appellant struck the complainant with her car. Either the
complainant became airborne or his body was carried on the hood of the Mercedes
as appellant drove over two curbed, grassy medians that separated the rows of parking
spaces. The complainant’s body landed or was deposited on the paved area of the
parking lot next to the second grassy median approximately 65 feet from where he
had first been hit, and appellant drove over the body. At the time of the incident, the
parking lot was nearly empty. 
          A videotape of somewhat poor quality, taken by the private investigator, shows
that the Mercedes made at least two 360-degree turns in this area of the parking lot. 
The first circle was wide, followed by a noticeably sharper circle. Appellant then
made one more half-circle and stopped the car next to the complainant’s body. The
Nassau Bay Police, upon arriving on the scene, summoned emergency medical
service and then transported appellant to the police station.
The Trial
          In addition to Lindsey Harris, six eye-witnesses—Evangelos Smiros, the hotel
manager; Paul Garrett Clark, the front desk manager; Jose Miranda, the night
manager; and three tennis players who were on the nearby courts: Ashok Moza,
Chris Junco, and Oscar Torres—testified at trial that appellant had driven over the
complainant’s body multiple times while circling in the back parking lot. Their
testimony differed in certain details. Smiros testified that appellant ran over the
complainant’s body three times; Clark testified that appellant ran over appellant three
times and then backed up over him for a fourth time. Miranda testified that appellant
ran over the body two times. Moza testified that the Mercedes twice ran over what
he initially believed to be a duffel bag, but that, upon approaching the scene, “it
turned out to be a human being.” Junco testified that he saw appellant drive over the
complainant three times. Torres testified that he saw the Mercedes round the corner
of the Navigator, and, when it reappeared, the Mercedes and the complainant’s body
were “flowing” together, and appellant then ran over the complainant’s body three
times.
          Appellant’s expert witness, accident reconstructionist Steve Irwin, testified
during a Daubert hearing and at trial that appellant could only have run over the
complainant once after initially hitting him as he was standing by the Navigator. He
further testified at trial that appellant, as she came around the Navigator, would not
have had enough time to stop before striking the complainant. To support this claim,
appellant offered into evidence two videotapes, Defendant’s exhibits 37 and 38, made
by Irwin.
          Defendant’s exhibit 37 re-created the route driven by appellant on the night in
question. This exhibit was a live-action videotape depicting the route appellant drove
after leaving her parking space in the front parking lot of the Nassau Bay Hilton,
going around the Black Navigator, striking the complainant, and then continuing on
for the two-and-a-half 360 degree turns in the empty parking lot area before coming
to a complete stop. To represent the complainant, Irwin placed a person behind the
partially open driver’s door of a black Navigator with his back to the camera. The
videotape purported to show appellant’s viewpoint from the driver’s seat. The
videographer sat in the middle of the backseat of a rented Mercedes S430. Irwin
conceded at the Daubert hearing that the driver would have had a better view of
events than the videotape showed. Irwin further testified that the speed of the car in
the videotape did not match that of appellant’s Mercedes on the night in question
because he did not want to damage the undercarriage of the rented Mercedes. 
          Defendant’s exhibit 38 was a virtual reality re-creation of appellant’s route in
the parking lot, making use of computer animation, simulation, and the videotape
taken by the private investigator. Irwin used measurements taken by the police and
hundreds of his own measurements in constructing the videotape to buttress his
theory that, given the final resting place of the complainant’s body and the location
of a blood stain beside the body, appellant ran over the complainant only once. This
videotape omitted any model or dummy to represent the complainant. Instead, Irwin
placed an “X” to mark the bloodstain that was found near the body. Irwin testified
that the Mercedes never drove through the bloodstain. After conducting a Daubert
hearing, the trial court excluded exhibits 37 and 38 from the evidence. 
          During the guilt-innocence phase of the trial, appellant testified in her own
defense about the night in question. She testified that she wanted to hit the Navigator
and maintained that she never intentionally hit the complainant. She testified as
follows: 
Q: [Defense Counsel]: At the time you intended to hit the Navigator,
did you know where David and Gail were?
 
A: No.
 
Q: Did you see them at that time – 
 
A: No.
 
Q: – as you rounded the corner?
 
A: No
***
Q: Did you intend to hit David with your car?
 
A: No
 
Q: Did it ever dawn on you that there might be people on [the
driver’s] side of the Navigator, as you rounded the corner to hit
the automobile?
 
A: No.

***
 
Q: [Prosecutor]: Did you hit David with the car?
 
A: I didn’t see hitting him with the car. I saw him running to the left,
and I kept looking at him running.
 
Q: Well, let me interrupt you because didn’t you tell – you’re telling
us now that you didn’t see that you had hit him?
 
A: Yes.

***
 
Q: So you are saying when you first hit him, the initial impact,
you’re saying it’s an accident, despite the fact that you told the
police that you wanted to separate him from her and that you
wanted to hurt him? You are now saying today in this courtroom
that it was an accident, despite the statements that you made to
the police?

***
 
A: I know it was an accident.

          Lindsey Harris, the only witness in the car with appellant, testified as to her
recollection about events that night and answered questions concerning the wrongful
death lawsuit she had filed against appellant.


 The relevant parts of her testimony are
as follows:
Q: [Prosecutor]: When the defendant saw your dad standing [next to
the Navigator with] Gail Bridges, did she say anything?
 
A: Yes.
 
Q: What did she say?
 
A: “I’m going to hit him.”
 
Q: And when she said, “I’m going to hit him,” how did she say it?
 
A: Like, that’s what’s going to happen. She was very determined,
that’s what was going to happen, that’s what she was going to do. 

***
 
Q: [Defense counsel]: And you mentioned that – and I think it was
when Clara goes into the hotel after the elevator door opens, you
described [Clara Harris] as, “She was evil, there was an evil look
on her face”?
 
A: Yes.
 
Q: Is that right?
 
A: Yes.
 
Q: Did any of the lawyers with the wrongful death lawsuit suggest
to you that that might be a good word to use?
 
A: No
 
Q: Do you remember having a conversation with Christina at your
grandparent’s house?



 
A: About what?
 
Q: Do you remember having a conversation with Christina at Clara’s
house?
 
A: I’ve talked with Christina a lot of times at Clara’s house.
 
Q: Did you have a conversation with Christina at any time, say, for
instance, two days after your dad’s death?
 
A: Yes.
 
Q: And did you talk with Christina about the role of the civil lawyers
in this case?
 
A: No. 

          At trial, defense counsel attempted to impeach Lindsey by calling Christina
Fondren, who testified as follows:
Q: Did you have an occasion to have a conversation with Lindsey
Harris?
 
A: Yes.
 
Q: Did Lindsey Harris tell you anything about lawyers?
 
[Prosecutor]: Objection, hearsay.
 
[Defense counsel]: Your honor, we would go –
 
The Court: Sustained.
 
[Defense Counsel]:We would go on prior
inconsistent statements.
 
The Court: Ask another question.
 
Q: [Defense Counsel]


 Did you have a conversation with Lindsey
Harris about attorneys that she and her family had hired to
represent her relative to this matter?

          . . . .
 
A: Yes.
 
Q: Did Lindsey tell you that the attorneys had instructed her to get
her story straight?
 
[Prosecutor]: Objection. It’s double hearsay and –
 
The Court: Sustained. 
 
Q: Did Lindsey Harris tell you that she had seen her father as the
Mercedes came around the corner of the Navigator?
 
[Prosecutor]: Objection, Judge. This is not an
inconsistent statement.
 
The Court:Approach the bench.

          The trial court ruled that Lindsey had been impeached when Christina Fondren
had contradicted her testimony by testifying that a conversation regarding the role of
the civil lawyers in the instant case had indeed taken place. The court further stated
that it would sustain the State’s objection as to the further specific questions
regarding Christina Fondren’s conversation with Lindsey because Lindsey had not
had an opportunity to admit or deny those statements.
          After both sides had rested, appellant requested an additional jury charge on
the lesser included offense of reckless driving. The trial court denied this request. 
At the punishment hearing, appellant asked to make both the opening statement and
the closing argument, arguing that she had the burden of proof on the issue of sudden
passion and was therefore entitled to open and close. The trial court denied this
request. 
DISCUSSION
I.       Exclusion of Defendant’s Exhibits 37 and 38
          In her first two points of error, appellant contends that the trial court abused its
discretion by excluding from evidence Defendant’s exhibits 37 and 38. Appellant
argues that the videotapes were made using valid scientific principles, the videotapes
are relevant, there is a trend toward admitting relevant and reliable demonstrative
evidence, and the trial court’s stated reasons for excluding the videotapes are invalid. 
          Before ruling on the admission or exclusion of the videotapes, the trial court
recognized the validity of the field of accident reconstruction and Irwin’s
qualifications as an accident reconstructionist. The trial court also stated that the
evidence being offered was relevant to the case. The court then expressed its
reservations about the reliability of the two videotapes and stated the following:
I have serious reservations not only about the reliability of those,
but in how they may mislead the jury for a number of reasons. I mean,
one, to use the sanitized phrase “pedestrian,” one omits any pedestrian,
and the other inserts a pedestrian in an arbitrary position and we don’t
know whether it’s accurate or not. Admittedly, the speeds are not
necessarily accurate, the perspective of the camera that’s shown, as if
it’s the person inside the vehicle and driving the vehicle, is confusing,
to say the least, if not misleading.
 
There is no body and the defense rightly pointed out they avoided
trying to re-create and confuse by having a body flying through the air
or not in a certain way that would be misleading. On the other hand, we
don’t have a body at all. Occasionally, we see a blood - - a marker for
a bloodstain that probably is several inches. I’m not sure of the exact
dimension, but I think inches would be a legitimate description as
opposed to a 5-foot 9-inch body that obviously was out there somewhere
on the ground. I’m not sure where. 
 
But given all of those things combined, I feel like, in weighing the
probative value against any unfair prejudice, the danger of misleading
and confusing the jury by the admission of Defendant’s Exhibits 37 and
38 outweighs the probative value. Therefore, I’m not going to permit
those to be shown to this jury.

          The standard of review for a trial court’s admission or exclusion of evidence
is abuse of discretion. Spradlin v. State, 100 S.W.3d 372, 381 (Tex. App.—Houston
[1st Dist.] 2002, no writ). A trial court must be given wide latitude in its decision to
admit or exclude evidence. Theus v. State, 845 S.W.2d 874, 881 (Tex. Crim. App.
1992). As long as the trial court’s evidentiary ruling was at least within the zone of
reasonable disagreement, an appellate court may not disturb it. Ellis v. State, 99
S.W.3d 783, 788 (Tex. App.—Houston [1st Dist.] 2003, pet. ref’d). There should be
“reluctance on the part of an appellate court to reverse trial court decisions which
admit or exclude evidence.” Montgomery v. State, 810 S.W.2d 372, 378 (Tex. Crim.
App. 1990). 
          The specific issue before us is whether the trial court’s exclusion of
Defendant’s Exhibits 37 and 38 falls outside the zone of reasonable disagreement,
thus rendering the court’s ruling an abuse of discretion. 
          The Rule 403 Balancing Test
          Relevant evidence can be excluded if its probative value is “substantially
outweighed by the danger of unfair prejudice, confusion of the issues, or misleading
the jury, or by consideration of undue delay, or needless presentation of cumulative
evidence.” Tex. R. Evid. 403; Montgomery, 810 S.W.2d at 377. Here, the trial court
was concerned that the inaccuracies represented in the videotapes would be
misleading and confusing to the jury. 
          Appellant conceded that the speed of the rented Mercedes and the perspective
of the camera in the center of the backseat in Exhibit 37 were not accurately depicted. 
Irwin also testified that he did not know the exact position of the complainant as he
stood near the open Navigator door, although Exhibit 37 showed a person purporting
to represent the complainant standing inside the open door. 
          Exhibit 38 purportedly established that the complainant was run over only once
by demonstrating that the Mercedes never drove over the blood stain. However,
Irwin testified that the bloodstain resulted from the last time the Mercedes ran over
the complainant, whether that last time was the first run-over or the second or the
third. The trial court was also concerned that the omission of a body near the
bloodstain would be misleading and confusing to the jury. We note that the issue
here is not whether appellant ran over the bloodstain, but whether she ran over the
complainant’s body more than once. 
          We conclude that the trial court’s exclusion of Defendant’s Exhibits 37 and 38
on the basis that they would be misleading and confusing to the jury falls within the
zone of reasonable disagreement. Accordingly, we hold that the trial court did not
abuse its discretion in excluding the two videotapes. We overrule appellant’s first
and second points of error. 
II.      Constitutional Violations
          In her third and fourth points of error, appellant contends that the trial court
violated her rights under the Sixth and Fourteenth Amendments


 by excluding
Defendant’s exhibits 37 and 38, thereby precluding her from presenting a complete
defense. 
          In Gilmore v. Taylor, the United States Supreme Court stated that a defendant
must have an opportunity to put on a meaningful defense. 508 U.S. 333, 343, 113 S.
Ct. 2112, 2118 (1993). The exclusion of evidence by a trial court can rise to the level
of a constitutional violation. Potier v. State, 68 S.W.3d 657, 659 (Tex. Crim. App.
2002). However, erroneous evidentiary rulings rarely rise to the level of denying the
fundamental constitutional right to present a meaningful defense. Id. at 663. 
          In Potier, the Court of Criminal Appeals canvassed federal court opinions to
gauge the different standards those courts applied in determining whether the
exclusion of evidence amounted to a constitutional violation. See id. at 662-63 n.31. 
“One court has held that a trial court’s exclusion of evidence must effectively prevent
a defendant from advancing his defensive theory before rising to the level of a
due-process violation.” Id. at 663 (citation omitted). The Court of Criminal Appeals
also cited another federal circuit court which held that the exclusion of self-defense
testimony constituted constitutional error because such exclusion precluded the
defendant from presenting to the jury critical evidence regarding her state of mind
during the killing. Id. at 663-64 (citing DePetris v. Kuykendall, 239 F.3d 1057,
1062-63 (9th Cir. 2001)). 
          The exclusion of Defense Exhibits 37 and 38 did not constitutionally impair
appellant’s opportunity to present a complete defense. “A defendant’s right to present
relevant evidence is not unlimited, but rather subject to reasonable restrictions.”
United States v. Scheffer, 523 U.S. 303, 308, 118 S. Ct. 1261, 1264 (1998). The
exclusion of evidence at criminal trial does not violate an accused’s ability to put on
a complete defense unless the exclusion is arbitrary. See id. 
          Here, the trial court allowed the defense’s expert to testify as an accident
reconstruction expert. Irwin also testified regarding the essential and critical aspects
of appellant’s defense (1) that she did not intentionally hit the complainant as she
rounded the corner of the Navigator and (2) that she only ran over the complainant
once. Furthermore, a substantial number of charts and drawings illustrating Irwin’s
theories were admitted into evidence. These exhibits included Defendant’s exhibits
30 through 35, which are posters illustrating Irwin’s opinion of the movement of
appellant’s Mercedes as it circled in the parking lot. The exclusion of the videotapes
simply precluded appellant from introducing evidence in a format that the trial court
considered to be misleading and confusing. The substance of appellant’s argument
was presented to the jury, and the exclusion of the videotapes did not prevent
appellant from putting on a complete defense. 
          We overrule appellant’s third and fourth points of error. 
III.    Impeachment by Prior Inconsistent Statements
          In her fifth point of error, appellant claims that the trial court erred by
disallowing her attempt to impeach Lindsey Harris with prior inconsistent statements. 
          Rule 613(a), which governs the impeachment of a witness with prior
inconsistent statements, provides in pertinent part: 
In examining a witness concerning a prior inconsistent statement
made by the witness, whether oral or written, and before further cross-examination concerning, or extrinsic evidence of, such statement may
be allowed, the witness must be told of the contents of such statement
and the time and place and the person to whom it was made, and must
be afforded an opportunity to explain or deny such statement. 

Tex. R. Evid. 613(a). Thus, before a witness may be impeached, she must be
informed of the statement’s content, the time and place at which it was made, and the
person to whom it was made. Flores v. State, 48 S.W.3d 397, 404 (Tex. App.—Waco
2001, pet. ref’d). If the impeaching party does not lay a proper predicate, the prior
inconsistent statement should not be admitted. Moore v. State, 652 S.W 2d 411, 413
(Tex. Crim. App. 1983). 
          Whether the trial court ruled correctly in precluding appellant’s trial counsel
from further impeaching Lindsey turns on whether counsel laid the requisite predicate 
for the question: “Did Lindsey tell you that the [civil] attorneys had instructed her to
get her story straight?” 
          When asked by defense counsel whether she had talked with Christina at
Clara’s house, about two weeks after the incident, concerning the role of civil lawyers
in coaching Lindsey’s testimony in the instant case, Lindsey said, “No.”        
          Defense counsel called Christina Fondren as a witness, and Christina testified
that she had had a conversation with Lindsey about attorneys whom Lindsey and her
family had hired to represent her. The trial court sustained the State’s objection to
defense counsel’s follow-up question, “Did Lindsey tell you that the attorneys had
instructed her to get her story straight?” Appellant had not laid the proper predicate
to that question by asking Lindsey if she had told Christina that the attorneys had
given her such an instruction. Therefore, the question was an improper attempt to
impeach Lindsey. 
          We hold that the trial court did not err in sustaining the State’s objection to
appellant’s attempted impeachment. We overrule appellant’s fifth point of error.
IV.    Lesser Included Offense of Reckless Driving
          In her sixth point of error, appellant contends that the trial court erred by
refusing to instruct the jury on the lesser included offense of reckless driving. The
State charged appellant with murder by intentionally and knowingly causing the death
of David Harris by striking him with a motor vehicle. 
          Article 37.09 of the Code of Criminal Procedure outlines the circumstances
under which a defendant is entitled to a jury instruction on a lesser included offense
as follows: 
An offense is a lesser included offense if: 
(1) it is established by proof of the same or less than all the facts
required to establish the commission of the offense charged; 
 
(2) it differs from the offense charged only in the respect that a
less serious injury or risk of injury to the same person, property, or
public interest suffices to establish its commission; 
 
(3) it differs from the offense charged only in the respect that a
less culpable mental state suffices to establish its commission; or 
 
(4) it consists of an attempt to commit the offense charged or an
otherwise included offense. 

Tex. Code Crim. Proc. Ann. art. 37.09 (Vernon 1981). 

          To determine whether a defendant is entitled to lesser included offense
instruction, a two-pronged test applies: (1) the lesser included offense must be
included within the proof necessary to establish the offense charged and (2) some
evidence must exist in the record that would permit a jury rationally to find that, if the
defendant is guilty, he is guilty only of the lesser included offense. See Wesbrook v.
State, 29 S.W.3d 103, 113 (Tex. Crim. App. 2000) (stating basic test for when
defendant is entitled to instruction on lesser included offense). 
          A person commits an offense of reckless driving if the person: (1) drives a
vehicle; (2) in wilful and wanton disregard; (3) for the safety of persons or property. 
See Tex. Transp. Code. Ann. § 545.401(a) (Vernon 1999). Wilful and wanton
disregard as applied to reckless driving means deliberate and conscious indifference
to the safety of others. Benge v. State, 94 S.W.3d 31, 36 (Tex. App.— Houston [14th
Dist.] 2002, pet. ref’d). 
          A person commits an offense of murder if the person intentionally or
knowingly causes the death of an individual or if the person intends to cause serious
bodily injury and commits an act clearly dangerous to human life that causes the
death of an individual. Tex. Pen. Code Ann. § 19.02(b)(1)–(2) (Vernon 2003)
(emphasis added). A person commits an offense of manslaughter if the person
recklessly causes the death of an individual. Tex. Pen. Code Ann. § 19.04 (Vernon
2003). 
          Even assuming, for the sake of argument, that the evidence could have
established that appellant drove her vehicle, not with the intent to kill or to cause
serious bodily injury, but in wilful and wanton disregard for the safety of the
complainant, it is uncontested that the complainant died as a result of appellant’s
actions. Therefore, the jury could not rationally have found that appellant was guilty
only of the offense of reckless driving. See Jackson v. State, 992 S.W.2d 469, 475
(Tex. Crim. App. 1999) (stating that when one recklessly causes death of another,
offense is manslaughter) . 
          We overrule appellant’s sixth point of error. 
V.      Opening and Closing Arguments
          In her seventh point of error, appellant contends that the trial court erred in
refusing to allow defense counsel to make the opening and concluding arguments at
the sentencing phase of the trial because section 19.02 of the Penal Code places the
burden of proof on the defense to establish “sudden passion arising from an adequate
cause” by a preponderance of the evidence. See Tex. Pen. Code Ann. § 19.02(d)
(Vernon 2003). To support this contention, appellant relies wholly on her attempt to
distinguish Martinez v. State, 501 S.W.2d 130 (Tex. Crim. App. 1973). 
          In Martinez, the defendant contended that, because he had the burden of proof
concerning his affirmative defense of insanity, the civil rules of procedure should
apply and he should be able to make the closing argument to the jury. Id. at 131. The
court held that, under the statute providing that the State has the right to make the
concluding address to jury, the trial court had no choice but to deny defendant’s
motion to conclude the argument. Id. at 132 (discussing Tex. Code Crim. Proc.
Ann. art. 36.07 (Vernon 1981)). Appellant contends that, although Martinez is
controlling, it is distinguishable because the court’s rationale applies only to the guilt-innocence phase of the trial, whereas in the instant case, appellant had already been
found guilty, and her request to open and close pertained to the punishment phase. 
          When the legislature amended section 19.02 of the Penal Code in 1993, it re-characterized “sudden passion arising from an adequate cause” from an element of
voluntary manslaughter into a sentencing factor that required a defendant to produce
evidence raising “sudden passion.” See Act of May 29, 1993, 73d Leg., R.S., ch. 900,
§ 1.01, secs. 19.02(b)(3), (d), 19.04, 1993 Tex. Gen. Laws 3586, 3613-14. The
amended statute placed on the defendant the burden of proof by a preponderance of
the evidence. See Tex. Pen. Code Ann. 19.02(d).
          Appellant, then, is asking us to read into the 1993 amendment the further
proposition that, when the legislature made this change, it also impliedly abrogated
article 36.07 of the Code of Criminal Procedure, at least as that provision applies to
the sentencing phase of the trial. See Tex. Code Crim. Proc. Ann. art 36.07 (Vernon
1981) (stating that “the order of argument may be regulated by the presiding judge,
but the State’s counsel shall have the right to make the concluding address to the
jury”). However, appellant cites no authority for this interpretation. 
          We note that, even if appellant were correct in her interpretation of section
19.02, she could not show harm. The jury found that appellant had indeed been
acting under “sudden passion arising from an adequate cause.” Therefore, the order
of the argument did not disadvantage appellant in meeting her burden.
          We overrule appellant’s seventh point of error. 
CONCLUSION
          We affirm the judgment of the trial court. 
 
 
                                                                        Sam Nuchia
                                                                        Justice

Panel consists of Chief Justice Radack and Justices Taft and Nuchia.

Publish. Tex. R. App. P. 47.2(b).