**Opinion issued August 22, 2013**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-11-01035-CR

———————————

**BLAKE CODY POWELL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 176th District Court**
**Harris County, Texas**
**Trial Court Case No. 1299228**

---

## MEMORANDUM OPINION

Blake Cody Powell pleaded guilty to aggravated assault with a deadly weapon[1] without a punishment recommendation from the State and was sentenced

---

[1] TEX. PENAL CODE ANN. § 22.02(b) (West 2011) (second-degree felony).

to eight years' confinement in TDCJ by the trial court. Appellant timely filed a motion for new trial that was denied without a hearing.[2] In two issues, appellant contends that (1) the trial court abused its discretion when it denied his motion for new trial because (a) his plea was involuntary, and (b) his trial counsel was ineffective during the punishment phase of his plea proceedings, and (2) the trial court abused its discretion by refusing to allow defense counsel to cross-examine the complainant about appellant's good character during punishment.[3]

We affirm.

## Background

Appellant pleaded guilty to "unlawfully, intentionally and knowingly threaten[ing] Dustin Ford with imminent bodily injury by using and exhibiting a deadly weapon, namely, A FIREARM." Although no transcript of the plea is included in the appellate record, the clerk's record reflects that appellant was properly admonished in writing by the trial court. Appellant signed and initialed written admonishments, which included the range of punishment, waiver of a jury

---

[2] Appellant does not argue that denial of his request for a hearing on his motion for new trial was an abuse of discretion.

[3] We construe appellant's argument that "he received ineffective assistance of counsel because of the Court's refusal to allow his counsel to cross-examine witnesses about the defendant's character" as two separate arguments and we will address them as such: (1) trial counsel was ineffective for failing to provide mitigating evidence regarding appellant's good character during punishment, and (2) the trial court erred in excluding the testimony.

2

trial, representations that he understood the consequences of his plea, that he was mentally competent, that he made his plea freely and voluntarily, and that he was satisfied with his attorney's representation. After properly admonishing appellant, the trial court accepted his plea, ordered the preparation of a presentence investigation report (PSI), and reset the case for sentencing. In the interim, a PSI was prepared and appellant submitted to a Psychological Forensic Evaluation by Dr. Walter Quijano. Dr. Quijano's evaluation was attached as an addendum to the PSI.

## A.     Ford's Testimony

At the sentencing hearing, the State called the complainant, Ford, to testify about the underlying assault. According to Ford, he and appellant had worked together for several months, and he considered appellant a friend. One day, however, Ford saw appellant stumbling in the parking lot and became concerned that appellant was intoxicated. Ford reported his concerns to his supervisors, and appellant was promptly fired.

Ford finished his shift and returned home around 1:30 a.m. He was sitting in his truck parked in his driveway talking on his cell phone when he noticed appellant's truck pull in and park behind him. Appellant got out of his truck, walked up to Ford's driver's side window, and hit the window repeatedly with a motorcycle/dirt bike helmet until it shattered. Appellant then struck Ford's

3

forearm with the helmet several times through the broken window, as Ford tried to shield his head from the attack.

According to Ford, appellant then stepped back from the truck and yelled, "I've got my gun." Ford was "deathly afraid" that his pregnant fiancé, who was in the house at the time, could be accidentally killed if there was gunfire, so he backed up his truck to quickly flee, hitting appellant's truck in the process, and drove across the grass and onto the main road. Ford, who had not lived in the neighborhood for very long, turned right at the next street, not realizing that the street was a cul-de-sac.

After Ford turned his truck around in one of the driveways, he saw appellant's truck parked at the corner. Appellant leaned out of the passenger-side window of his truck with his Glock in his hands and fired two or three shots at Ford's stationary truck. Ford, who had to drive past appellant's truck to leave the subdivision, leaned back in the driver's seat and took off. Appellant continued to fire at Ford's truck as he drove by. Ford made a left at the main road and headed towards the interstate. Appellant followed Ford out of the subdivision, firing several more shots into the bumper and tailgate of Ford's truck. Ford, who ran several red lights in an attempt to get away from appellant, turned left onto the feeder road and appellant turned right.

4

Several days later, Ford was driving on Beltway 8 on his way to work when he observed a car approaching him from behind; appellant was behind the wheel. Appellant was honking his horn, swerving his vehicle at Ford's vehicle, making obscene gestures, and screaming at Ford. According to Ford, the entire encounter lasted only ten to fifteen seconds.

On cross-examination, Ford testified that appellant's wife and kids would bring appellant lunch every day when he was at work and he observed appellant's interaction with the children. At that point, defense counsel attempted to elicit testimony from Ford as to appellant's good character.

Q. (DEFENSE) Did you have an opinion as to [appellant's] focus with his children?

STATE: Objection, relevance.

THE COURT: What is the relevance with this witness?

DEFENSE: My position is that my client's a good father and this witness has --

THE COURT: Well, if this was a child abuse case I might be more interested, but go ahead, ask him. Let's --

Q. (DEFENSE) In your opinion, is [appellant] a good father?

A. From what I --

STATE: I renew my objection to speculation and relevance.

THE COURT: That's sustained.

Let's please move on to something relevant.

5

**B.      Appellant's Testimony**

Appellant also testified at the hearing, but he offered a somewhat different version of events.  According to appellant, he and his wife were driving back from the beach when he realized that they were near Ford's neighborhood, and he decided to try to find out where Ford lived.  When appellant and his wife drove past Ford's home about 2:30 that morning, appellant was surprised to see Ford sitting in his truck with his cab lights on, and he turned his truck around.  Appellant parked in front of Ford's house, grabbed a helmet from the backseat of his truck, walked over to Ford's truck and yelled at Ford to get out.  When he was unable to open Ford's driver's side door, appellant started banging on the windows.  According to appellant, "I lost my temper at the time and was probably going to beat him up."

At that point, Ford backed his truck into the driver's side of appellant's vehicle, and took off across the grass.  Appellant got into the passenger seat of his truck, and his wife drove off toward the main road.  When appellant's wife mistakenly turned right at the next street, which happened to be the same cul-de-sac that Ford had mistakenly turned onto, appellant saw Ford's vehicle turning around in someone's driveway.  According to appellant, Ford started driving towards them at a high rate of speed and he was afraid that Ford would hit them head-on, so he pulled his gun from the center console and started firing at Ford's

6

engine and tires in an attempt to disable the vehicle. Ford's truck scraped appellant's truck as Ford drove by. Appellant testified that he never intended to shoot Ford, just stop his vehicle. He also denied either chasing after Ford or firing at Ford's vehicle when it was stopped. According to appellant, he only shot at Ford's vehicle when they passed on the dead-end street.

Appellant testified that, at his counsel's request, he had been to see a psychiatrist but was unsure if he was taking his prescriptions for Clonazepam and Lexsee at the time of the assault. He further expressed remorse: "I want to say I'm sorry. . . I almost took his life over nothing." Appellant wished to express his remorse over the incident earlier, but on advice of counsel refrained from doing so until trial.

On cross-examination, appellant testified that, although he had previously pleaded guilty to intentionally and knowingly threatening Ford with imminent bodily injury, he did not actually believe that he was guilty of the offense because he never intended to kill, harm, or even threaten Ford. Appellant stated that he only pleaded guilty because his counsel advised him to do so. The State asked him if he believed that he was acting in self-defense:

Q. (STATE) Are you saying it was self-defense, yes or no?

A. At the time I fired the weapon, yes. At the time I went to his house, no.

Q. Because when you went to his house --

A. I instigated it all.

Q. Right. You wanted to kick his ass?

A. Yes, sir.

When asked if he wanted revenge when he approached Ford in the driveway, appellant testified, "I'm bipolar. I snapped. And I don't know what I wanted at the time." Appellant further testified that had he wanted to kill Ford, he "would have got[ten] out [of his truck] with the gun," not the dirt bike helmet.

Appellant admitted that he had been placed on deferred adjudication for a prior offense and required to attend anger management classes. Although he used to take Depakote, he had weaned himself from it and was not taking it at the time of the assault.

Apparently troubled by appellant's testimony, the trial court began to question appellant about the voluntariness of his prior guilty plea. Appellant informed the trial court, that after doing his own legal research, he believed that he was only guilty of "deadly conduct," not aggravated assault, and he believed that he pleaded guilty to the wrong charge. When the trial court reminded appellant of the representations he had made to the court when he originally made his plea, appellant stated, "I was really confused and really didn't understand the charge." Upon further questioning from the court about the truthfulness of his prior

8

statements, appellant stated, "My anxiety's bothering me right now and I'm getting confused." The trial court instructed appellant to step down off the witness stand.

At that point, appellant's counsel attempted to proffer the testimony of several witnesses who had written letters in support of appellant. The trial court assured appellant's counsel that it was not necessary to do so because she had already read all of the letters and she would take judicial notice of their contents.

In his closing argument, defense counsel asked for deferred adjudication and noted that appellant had "some prior cases that reflect some issues of mental -- some kind of mental disorder. I'm not a doctor. The -- I took him -- or had a doctor evaluate him. I think he has some mental health previous diagnosis that would suggest bipolar anxiety, some issues that need to be addressed."

Before the State made its closing argument, the trial court stated, "[E]ssentially we have a defendant here today who said his plea was entered involuntarily upon improper advice from counsel. So I need to ask him before we go any further [if it is] his desire to withdraw his plea of guilty and set this case for trial?" The trial court further stated:

> He has sat here under oath and said that he didn't know anything that he was doing when he entered a plea of guilty to aggravated sexual [sic] assault with a deadly weapon, that he did not commit this offense, that he acted in self-defense, whether -- as we all know, whether or not that would legally fly or not, but I'm more concerned with he told me he lied to the Court at every question and admonishment that the Court gave

9

him at the time that he entered his plea, his plea was legally involuntarily entered.

I will give him the opportunity right now to withdraw that plea of guilty and we will set this case for trial, get it tried before Christmas and let the dice fall where they roll. So if you'd like to take a minute or two and consult with him, because there's no point in me going ahead with any sort of sentencing and having him say later, well, I never -- you know, regardless of what the sentence is, going on forever saying I was never guilty of that, I didn't want to plead, my lawyer forced me to do it, which is what he said here today.

So why don't you take a moment or two, not much longer, because I'm running out of time here, and decide what you want to do.

. . .

THE COURT: All I want to know is does he want to withdraw his plea of guilty and set this case for trial?

APPELLANT: No.

DEFENSE COUNSEL: No, your Honor, we do not want to withdraw our plea of guilty.

THE COURT: So you did intentionally and knowingly enter your plea of guilty to aggravated assault?

APPELLANT: Yes, ma'am.

THE COURT: And that's what you're guilty of?

APPELLANT: Yes, ma'am.

THE COURT: All right. Thank you.

. . .

APPELLANT: Could I ask you a question?

10

THE COURT: Sure.

APPELLANT: Since I did go over there and instigate it, does that mean that with firing the weapon that was not self-defense? Because I instigated what happened?

THE COURT: Yes. The testimony at least has been that you not only sought him out for no good reason, made the first approach, that you also pulled your gun and that you pursued him after he fled from you in an attempt to get out of the difficulty and chased him down and fired your weapon at him repeatedly. Yes, under the law that seldom constitutes an adequate self-defense.

APPELLANT: I did not chase him.

. . .

THE COURT: Okay. Take your chance. With a jury it all turns on who they believe. But yes, it's the fact that you sought him out and you initiated the difficulty, then you're going to have a hard time with a self-defense claim. But I can't predict the future. I don't care what you do, I just need to know. If you're going to have your plea of guilty entered that you've entered and let's go forward, that's what we'll do. If you didn't know what you were doing and now you want to have a trial, take back the plea of guilty, I'll let you do it and we'll set this case for trial, get it tried before Christmas and we'll all go on about our business. You just have to tell me, because after I sentence you it's going to be too late for that.

([Appellant] confers with [counsel].)

APPELLANT: I'm going to plead guilty today.

THE COURT: Huh?

APPELLANT: I want to plead guilty.

THE COURT: You want to leave the plea in place?

APPELLANT: Ma'am?

11

THE COURT: You want the plea to stay in place?

APPELLANT: Yes, ma'am.

Before pronouncing sentence, the trial court summed up her thoughts on the evidence presented at punishment, including the testimony of both Ford and appellant:

> I think you did seek him out. I think you were after revenge, but I'm also -- again, this is not an isolated incident in your life. These violent outbursts have been going on forever, and you just can't blame everything on being bipolar. I mean, everybody in society these days is diagnosed as bipolar. You took a baseball bat to your own home and destroyed the audio-visual equipment or whatever.
>
> . . .
>
> The fact that you tried to run into him on the freeway a few days after this incident, out of control again, yelling, screaming. You're a dangerous person, you really are.
>
> . . .
>
> I don't see remorse. I don't see remorse at all. I see you feeling real sorry for yourself, trying to make excuses and trying to blame things on everybody except [appellant]. But what I also see is a very violent and dangerous person. Way back when you were a juvenile throwing Molotov cocktails to taking your baseball bat and beating up the house, going to work drunk.
>
> . . .
>
> I just don't think you recognize what you've done to this man's life that you attacked. You took away everything that he had. So, anyway, I don't find [deferred adjudication] to be an appropriate sentence."

The trial court then found appellant guilty of the second degree felony offense of aggravated assault with a deadly weapon and assessed his punishment at

eight years' confinement in TDCJ.  Appellant filed a timely motion for new trial which was denied without a hearing.  This appeal followed.

**Denial of Motion for New Trial**

In his first issue, appellant contends that the trial court abused its discretion when it denied his motion for new trial because (a) his plea was involuntary, and (b) his trial counsel was ineffective during the punishment phase of his plea proceedings.

**A.  Standard of Review and Applicable Law**

We review the trial court's denial of the motion for an abuse of discretion, reversing only if the trial judge's opinion was clearly erroneous and arbitrary. *Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012).  A trial court abuses its discretion when no reasonable view of the record could support the trial court's denial of a new trial.  *Id.*; *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007).  This deferential review requires the appellate court to view the evidence in the light most favorable to the trial court's ruling, to refrain from substituting its own judgment for that of the trial court, and to uphold the trial court's ruling if it is within the zone of reasonable disagreement.  *Riley*, 378 S.W.3d at 457.

**1.  Applicable Law Regarding Voluntariness of Pleas**

Before accepting a plea of guilty, the trial court must administer certain admonishments. *See* TEX. CODE CRIM. PROC. ANN. art. 26.13(a) (West Supp.

13

2012).  The court may not accept the plea unless it appears to the court the plea is made freely and voluntarily.  *Id.* at art. 26.13(b).  We review the voluntariness of a plea by looking at the totality of the circumstances.  *Griffin v. State*, 703 S.W.2d 193, 196 (Tex. Crim. App. 1986).

Proper admonishment by the trial court establishes a prima facie showing that the defendant entered into a knowing and voluntary plea.  *Martinez v. State*, 981 S.W.2d 195, 197 (Tex. Crim. App. 1998); *George v. State*, 20 S.W.3d 130, 135 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd).  A defendant may, of course, still raise the claim that his plea was not voluntary, but the burden shifts to him to demonstrate that he did not fully understand the consequences of his plea.  *See Martinez*, 981 S.W.2d at 197.  Further, when a defendant affirmatively indicates at the plea hearing that he understands the proceeding's nature and is pleading guilty because the allegations in the indictment are true, not because of any outside pressure or influence, he has a heavy burden to prove that his plea was involuntary.  *George*, 20 S.W.3d at 135.

It is well-established that a court takes a case under advisement when it accepts a properly-admonished guilty plea and passes the case for pre-sentence investigation and punishment.  *See Jackson v. State*, 590 S.W.2d 514, 514–15 (Tex. Crim. App. 1979) (holding case had been taken under advisement, and defendant could not withdraw guilty plea as matter of right, where court had

14

accepted guilty plea and passed the case for pre-sentence investigation). The trial court is not required to withdraw a plea of guilty sua sponte and enter a plea of not guilty for a defendant when the defendant enters a plea of guilty before the court after waiving a jury, even if evidence is adduced that reasonably and fairly raises an issue as to his guilt. *See Thomas v. State*, 599 S.W.2d 823, 824 (Tex. Crim. App. 1980); *Moon v. State*, 572 S.W.2d 681, 682 (Tex. Crim. App. 1978); *Brown v. State*, 11 S.W.3d 360, 362–63 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). It is the duty of the trial court to consider the evidence submitted; as the trier of the facts, the court may find the defendant guilty of the charged offense, guilty of a lesser offense, or it may find the defendant not guilty as the facts require. *Thomas*, 599 S.W.2d at 824; *Moon*, 572 S.W.2d at 682.

### 2. Applicable Law Regarding Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of counsel, the defendant must show that (1) his counsel's performance fell below an objective standard of reasonableness, and (2) but for counsel's unprofessional error, there is a reasonable probability that the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064 (1984); *Andrews v. State*, 159 S.W.3d 98, 101–02 (Tex. Crim. App. 2005). A defendant has the burden to establish both prongs by a preponderance of the evidence; failure to make either showing defeats his ineffectiveness claim. *Lopez v. State*, 343 S.W.3d

15

137, 142 (Tex. Crim. App. 2011); *see Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002).

An appellate court must make a "strong presumption that counsel's performance fell within the wide range of reasonably professional assistance." *Robertson v. State*, 187 S.W.3d 475, 484 (Tex. Crim. App. 2006) (citing *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2055). In order for an appellate court to find that counsel was ineffective, counsel's deficiency must be affirmatively demonstrated in the trial record; the court must not engage in retroactive speculation. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). When direct evidence of ineffectiveness is not available, we will assume that counsel had a strategy if any reasonably sound strategic motivation can be imagined. *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001). The record on direct appeal will only in rare circumstances be adequate to show that counsel's performance fell below an objectively reasonable standard of performance. *See Andrews*, 159 S.W.3d at 102 (indicating that claims of ineffective assistance of counsel are normally best left for habeas corpus proceedings); *see also Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002) ("Under normal circumstances, the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or

16

strategic decision making as to overcome the presumption that counsel's conduct was reasonable and professional.").

Under certain circumstances, defense counsel's failure to provide mitigating evidence during sentencing may constitute ineffective assistance of counsel. *See Rivera v. State*, 123 S.W.3d 21, 31–32 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (holding that counsel's failure to present mitigating evidence fell below an objective standard of reasonableness where court could not attribute failure to "trial strategy"). However, "[t]he general rule is that the failure to call witnesses does not constitute ineffective assistance of counsel without a showing that the witnesses were available to testify and that their testimony would have benefitted the defendant." *Cate v. State*, 124 S.W.3d 922, 927 (Tex. App.—Amarillo 2004, pet. ref'd) (citing *Butler v. State*, 716 S.W.2d 48, 55 (Tex. Crim. App. 1986)).

## B.    Involuntary Plea

Appellant argues on appeal that: he did not understand the nature and severity of the charge he pleaded guilty to at the initial plea proceeding; he displayed confusion during the punishment hearing, during which time he stated that he was not guilty of the offense; and he only agreed to go forward with his plea after the trial court discussed the facts of the case with him and his counsel instructed him that he needed to go forward with the plea. Appellant also argues that, "Had the Court withdrawn appellant's plea of guilty after testimony revealed

17

appellant did not believe he was guilty of the charged conduct, but rather was guilty of a lesser included offense of 'Deadly Conduct', appellant would have been able to present his defenses to [a] jury." Appellant further contends that his plea was involuntary because he was informed by someone that if he pleaded guilty to the offense, then the case filed against his wife, who was originally listed as a co-defendant, would be dismissed.[4]

The clerk's record reflects that appellant was properly admonished in writing by the trial court before the trial court took the case under advisement (i.e., the court accepted his plea, ordered the preparation of PSI, and reset the case for sentencing). *See Jackson*, 590 S.W.2d at 514–15 (holding case taken under advisement when trial court had accepted guilty plea and passed case for PSI). As such, there is prima facie evidence in the record that appellant's guilty plea was entered knowingly and voluntarily and appellant bears the heavy burden of proving that his plea was involuntary. *Martinez*, 981 S.W.2d at 197; *George*, 20 S.W.3d at 135.

The record reflects that the trial court was concerned about the voluntariness of appellant's plea based upon his testimony at the punishment hearing. The trial court made a sua sponte inquiry into the nature of his plea. When appellant asked the court if the fact that he instigated the assault by going over to Ford's home that

---

[4] Appellant does not identify—either in his motion for new trial or his appellate brief—who he contends provided him with this information.

18

night meant that his use of the weapon was not self-defense, the trial court informed him, that, yes, based on the court's view of the evidence, he did not have a successful self-defense argument. The trial court also informed appellant that, "[w]ith a jury it all turns on who they believe," and although the court thought that he would have a "hard time with a self-defense claim," it could not predict the future. "I don't care what you do, I just need to know. . . . If you didn't know what you were doing and now you want to have a trial, take back the plea of guilty, I'll let you do it and we'll set this case for trial." After consulting with his trial counsel, appellant unequivocally stated that he wanted to keep his plea in place.

Although he was given an opportunity to do so, appellant never asked to withdraw his plea, and the trial court was not required to his withdraw his plea sua sponte. *See Thomas*, 599 S.W.2d at 824; *Moon*, 572 S.W.2d at 682; *Brown*, 11 S.W.3d at 362–63. The trial court considered the evidence submitted and found appellant guilty of the charged offense. *Thomas*, 599 S.W.2d at 824; *Moon*, 572 S.W.2d at 682. Appellant's allegations that he only agreed to go forward with his plea after his counsel instructed him that he needed to do so and that he was misled by some unidentified person or persons that the charges against his wife would be dismissed if pleaded guilty as charged are not supported by the record.

Based upon the record before us, appellant has failed to carry his heavy burden of establishing that his plea was involuntary. We overrule appellant's involuntary plea argument.

## C.    Ineffective Assistance of Counsel

Appellant contends that his trial counsel provided ineffective assistance of counsel by failing to call a material witness—Dr. Walter Quijano—to testify at trial. Dr. Quijano conducted a Psychological Forensic Evaluation on appellant that was attached as an addendum to the PSI and that was considered by the trial court when it assessed appellant's punishment. According to appellant, Dr. Quijano was a material witness in this case and could have provided insight into appellant's state of mind, as well as mitigation evidence to aid the trial court in assessing punishment. Appellant acknowledges that evidence of his mental health history was before the court. Nevertheless, appellant contends that, based upon comments the trial court made prior to sentencing him (i.e., "you just can't blame everything on being bipolar. I mean, everybody in society these days is diagnosed as bipolar"), a mental health expert like Dr. Quijano was necessary to explain the significance of appellant's diagnoses.

First, there is no evidence in the record that Dr. Quijano was available to testify at the hearing. *See Cate*, 124 S.W.3d at 927 (stating that in order to establish ineffective assistance of counsel based on failure to call witness,

20

defendant must show that witness was available to testify).  Second, evidence of a defendant's mental illness can be either a mitigating factor *or an aggravating factor* for the trial court to consider when assessing punishment.  *See Mays v. State*, 318 S.W.3d 368, 393–94 (Tex. Crim. App. 2010) (rejecting defendant's argument that "mental illness and its effects upon one's conduct are, as a matter of law, mitigating and can never be considered as rendering a person more likely to commit acts of violence").  Thus, even if Dr. Quijano had been available to testify about appellant's mental health history (i.e., his anger management issues and bipolar diagnosis), there is no evidence that Dr. Quijano's supplemental testimony would have benefited appellant.  *See Cate*, 124 S.W.3d at 927 (stating that in order to establish ineffective assistance of counsel based on failure to call witness, defendant must show that witness's testimony would have benefitted defendant).

In fact, based on the trial court's comments prior to sentencing, it is apparent that the trial court did not consider appellant's mental health history and associated history of violent outbursts as a mitigating factor, but rather an aggravating one. Moreover, even if Dr. Quijano had testified that appellant's violent outbursts were the result of his bipolar disorder and that such outbursts could be avoided in the future with proper medication and treatment, appellant has not demonstrated that such testimony would have benefited him.  For example, appellant acknowledged at trial that he had been prescribed Depakote as part of a prior anger management

21

treatment, he weaned himself off of the medication on his own initiative and he was not taking any medication when he assaulted Ford. As such, we hold that appellant has failed to demonstrate that Dr. Quijano's testimony on this issue would have benefited him.

Appellant also argues that his trial counsel was ineffective for failing to provide mitigating evidence regarding appellant's good character. On the contrary, the record reflects that defense counsel submitted over fifty letters written in support of appellant by members of the community. When appellant's counsel attempted to proffer the testimony of several of these witnesses, the trial court stated: "I know what they would say. They said it all in their letters. I read them, each and every one. . . . I will take judicial notice of the fact that the courtroom has several witnesses present to testify on [appellant's] behalf, all of whom wrote glowing letters on his behalf as to his abilities as a father, his general good guyness, and everything else." Appellant has failed to demonstrate that additional good character evidence would have benefited him.

Accordingly, we overrule appellant's ineffective assistance of counsel arguments. Having previously overruled his argument that his plea was involuntary, we hold that the trial court did not abuse its discretion when it denied appellant's motion for new trial. We overrule appellant's first issue.

## Exclusion of Mitigating Character Evidence

In his second issue, appellant contends that the trial court abused its discretion by refusing to allow defense counsel to cross-examine Ford about appellant's good character (i.e., Ford's opinion that appellant was a good father).

Article 37.07, section 3(a) of the Texas Code of Criminal Procedure governs the admissibility of evidence during the punishment phase of a noncapital trial and provides evidence may be offered by the State and defendant "as to any matter the court deems relevant" including evidence of his general reputation, his character, and opinions regarding his character. TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (West Supp. 2012); *see also Erazo v. State*, 144 S.W.3d 487, 491 (Tex. Crim. App. 2004) ("[W]e have explained that relevance during the punishment phase of a non-capital trial is determined by what is helpful to the jury"). We review a trial court's exclusion of evidence under an abuse of discretion standard of review. *Harris v. State*, 152 S.W.3d 786, 793 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd). As long as the ruling was within the zone of reasonable disagreement, we may not disturb it. *Id.*

The erroneous exclusion of evidence offered under the rules of evidence generally constitutes non-constitutional error and is reviewed under Rule 44.2(b). *Walters v. State*, 247 S.W.3d 204, 219 (Tex. Crim. App. 2007). We must disregard non-constitutional error that does not affect an appellant's substantial rights. *See*

TEX. R. APP. P. 44.2(b) ("Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). Substantial rights are not affected by the erroneous exclusion of evidence "if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002) (footnotes omitted). If the evidence is generally cumulative of other evidence introduced in the case, no harm attaches. *See Anderson v. State*, 717 S.W.2d 622, 628 (Tex. Crim. App. 1986) (holding that to show harm, excluded evidence must be controlling on material issue and not cumulative of other evidence); *see also Rangel v. State*, 179 S.W.3d 64, 70 (Tex. App.—San Antonio 2005, pet. ref'd) (holding no harm when complained-of excluded evidence was admitted through other testimony).

As previously discussed, the trial court considered at least fifty letters written in support of appellant by members of the community when deciding appellant's punishment. The trial court took judicial notice of the contents of these "glowing letters," which attested to appellant's "abilities as a father, his general good guyness, and everything else." Accordingly, even if the trial court abused its discretion when it excluded Ford's testimony, any such error was harmless because it was cumulative of other evidence introduced in the case. *See Anderson*, 717 S.W.2d at 628.

24

We overrule appellant's second issue.

## Conclusion

We affirm the trial court's judgment.

Justice Jim Sharp
Justice

Panel consists of Justices Keyes, Sharp, and Huddle.

Do not publish. TEX. R. APP. P. 47.2(b).