**Opinion issued August 30, 2018**



In The

# Court of Appeals

For The

## First District of Texas

_____

## NO. 01-17-00267-CR

_____

### JESUS JOSE LACER, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 33rd District Court
Burnet County, Texas[1]
Trial Court Case No. 44479**

### MEMORANDUM OPINION

---

[1]     Pursuant to its docket equalization authority, the Supreme Court of Texas transferred this appeal to this Court. *See* Misc. Docket No. 17–9035 (Tex. Mar. 28, 2017); *see also* TEX. GOV'T CODE ANN. § 73.001 (Vernon 2013) (authorizing transfer of cases).

A jury found appellant, Jesus Jose Lacer, guilty of the felony offenses of assault of a family member[2] and sexual assault,[3] and it assessed his punishment at confinement for ten years and twelve years, respectively. And the trial court ordered that the sentences run concurrently. In ten issues, appellant contends that the trial court erred in admitting certain evidence and not allowing appellant to "play[] in open court" two video recordings from his cellular telephone.

We affirm.

## Background

The complainant, Whittney Wills, testified that appellant, who she has known since she was fifteen years old, is her ex-boyfriend and the father of her two children, J.L. and I.L. (collectively, "the children"). Over the course of their approximately fourteen-year relationship, she lived with him "on and off." On May 8, 2015, while the complainant was living with appellant and the children[4] at the Lake LBJ motel in Burnet County, Texas, he, about mid-morning, entered their motel room angrily. Appellant and the complainant began arguing, and he started "slamming [her] around." Although she did not "swing back" or hit him, appellant screamed at the complainant, shoved her, and pushed her to the floor.

---

2     *See* TEX. PENAL CODE ANN. § 22.01(a)(1), (b)(2)(B) (Vernon Supp. 2017); *see also* TEX. FAM. CODE ANN. §§ 71.003, 71.005 (Vernon 2014).

3     *See* TEX. PENAL CODE ANN. § 22.011(a)(1)(A), (f) (Vernon Supp. 2017).

4     At that time, J.L. was eleven years old and I.L. was four years old.

2

While the complainant was on the floor, appellant got "on top" of her and put his hands around her neck. As he "chok[ed]" her, the complainant had difficulty breathing. Appellant also "stomped" on the complainant's ribs, and at some point, he "slapped [her] on [the] face," causing a bruise in the shape "of his handprint." When the complainant tried to "get up" off of the floor, appellant "tried to shove [her] back down," telling her to "stay there and shut up." She had difficulty breathing and thought that her ribs had been broken.

Eventually, appellant, who had continued screaming at the complainant, let her go to the bathroom. However, while she was in the bathroom, he "shoved [her] off [of] the toilet" and "tr[ied] to stick [her head] into the toilet." After the complainant "made it out of the bathroom," "there was just a lot of screaming," and appellant yelled, "This is the man you wanted. This is the man you got." (Internal quotations omitted.) Appellant then "shoved [the complainant] back[wards]," causing her head to hit the metal frame of the bed in the motel room. Because she thought that her head had been "busted open," she asked appellant to call for emergency assistance. He did not acknowledge her request.

The complainant noted that during the mid-morning assault on May 8, 2015, appellant made the children stay in the motel room so that they could "see[] everything." The children were scared, and J.L. tried to cover I.L.'s eyes "to shield her from seeing" the assault. The complainant explained that during the assault,

3

appellant did not choke her by "accident" or because of a "mistake." After the assault, he left the motel room, leaving her "on the floor." The complainant then laid down because she was "in a lot of pain."

The complainant further testified that appellant later returned to their motel room on the night of May 8, 2015. At the time, the children were sleeping and the complainant was lying down on the bed. Appellant asked her "to give him oral sex," and she said, "No." He then "came over" to where the complainant was lying down on her stomach and "pulled [her] pants down." She said, "[N]o," and appellant "forced himself on [her]." He "penetrate[d] [her] sexual organ with his sexual organ," and she cried, was hurt, and said "no." After the assault, appellant did not say anything and fell asleep.

The complainant explained that she did not "make up the story about the sexual assault" and the children remained asleep during it. Further, she noted that the mid-morning assault and the subsequent sexual assault were two separate incidents that both occurred on May 8, 2015. The assault occurred when "the sun was up" and the sexual assault occurred at "nighttime."

In regard to her relationship with appellant, the complainant admitted that she and appellant had used methamphetamine together, but she noted that she began using it because of him. Further, the complainant explained that during the course of their relationship, it was common for them to argue. And on previous occasions,

4

appellant had been angry, shoved her, and choked her. For instance, when J.L. was two years old, appellant "slammed" the complainant "up against [a] wall" while she held J.L. Appellant would also tell her to "shut up" and "backhand [her] in the face if [she] wasn't quiet."

In the time leading up to May 8, 2015, appellant had become "more and more violent" toward the complainant. Specifically, on April 27, 2015, at the Hill Country Lodge motel, appellant "caused . . . violence" to occur. The complainant and appellant "shov[ed] each other," he "tr[ied] to pull [her] out of [a] vehicle," and he was the aggressor. Because of this fight, appellant, the complainant, and the children moved from the Hill Country Lodge motel to the Lake LBJ motel at the end of April 2015.

On May 15, 2015, after the May 8, 2015 assault and sexual assault, two investigators from the Texas Department of Family and Protective Services ("DFPS") came to the Lake LBJ motel to speak with the complainant and the children. At that time, she did not tell either investigator about the sexual assault that had occurred on May 8, 2015, but they "could see the marks on [her] face" and a "grabbing mark" on her arm. And the complainant told them that appellant had assaulted her by impeding her breath. DFPS removed the children from the complainant's care on May 15, 2015, and when they were taken, she "c[ouldn't] live without [them]." The complainant also heard appellant, who was on a telephone

with a friend who was at the Lake LBJ motel at the time, say that "if [the complainant] didn't kill [herself], he would kill [her]."

Subsequently, on June 12, 2015, at a court hearing related to DFPS's removal of the children, the complainant told DFPS investigator Kristin Cantu about the sexual assault that had occurred on May 8, 2015. In response, Cantu told the complainant that she needed to report the sexual assault to law enforcement officers. After the hearing, Cantu then went with the complainant to the Burnet County Sheriff's Office, where the complainant gave a written statement to a law enforcement officer.[5]

The complainant further testified that after DFPS had removed the children from her care, she went to live at a "crisis center" for a few weeks and then stayed

---

[5] The trial court admitted the complainant's written statement into evidence. In it, she explained that on May 8, 2015, appellant, who was upset, entered their Lake LBJ motel room, yelled, and told the children to lay down. When the complainant told the children to leave the room, appellant "slapped [her] in [the] face so hard" that she could "see[] double." He choked her, "got [her on] the floor," and kicked her in her ribs. The complainant believed that her ribs had been broken. Because she "couldn't breath[e] or see straight," appellant helped her to the bathroom. He then pushed her off the toilet and "tried to slam [her] face in [the] toilet." After leaving the bathroom, appellant pushed the complainant, and she "hit [her] head on [the] bed railing." He spit on the complainant, and the children cried.

The complainant stated that later on May 8, 2015, appellant "asked if [she] would give him head" and she said "no." He then "got up and bent [her] over and [she] said no." The complainant was crying and "could not really breath[e] or move so [she] just la[id] there while [appellant] had sex with [her]." "[T]he whole time[,] [the complainant] was crying with [her] face in [the] pillow," and appellant told her that "he would snap [her] neck if [she] left out of [the] door."

6

at the Hill Country Lodge motel with a friend, Johnny Maxwell. On May 31, 2015, while the complainant, Maxwell, and Andrew Brennanan, Maxwell's neighbor, were all together in Maxwell's motel room, appellant came to the motel. He "pull[ed] up and jump[ed] out of [his] car," and he screamed outside of the motel room window that the complainant was a "whore." Appellant was "acting crazy at the window," "screaming at [her] that he was going to kill [her]." After the complainant called for emergency assistance, he "jumped back in [his] vehicle" and "took off." Two law enforcement officers came to see her later that day about the incident.[6]

J.L. testified that on May 8, 2015, appellant, who was upset, entered their Lake LBJ motel room. After appellant and the complainant began verbally fighting, he slapped her in the face and pushed her. He also spit on her, choked her while she was on the floor. Appellant "st[ood] on her" or "stepp[ed] on her" near her ribs. Specifically, J.L. saw her "gasping" while appellant put his hands around her throat. Appellant then said, "This is what you want. This is who you want." (Internal quotations omitted.) He also threatened to kill the complainant. Although J.L. and his sister, I.L., tried to leave the motel room, appellant would not let them.

---

[6]   The complainant also testified that after May 15, 2015, she saw appellant when "he was chasing . . . or harassing [her]." And at those times, she called for emergency assistance. During one instance, appellant "follow[ed]" her while she was driving her car. And "[t]here w[ere] multiple times where [appellant] would see [her] and harass [her]." She would be "in [her] car driving, and he would be behind [her]. . . . He would be like speeding up behind [her] and laughing," and she could see him in her rearview mirror.

In regard to appellant and the complainant's relationship, J.L. explained that they had spent his entire life "fighting." Although it was not physical fighting at first, appellant and the complainant began to fight physically when they moved to Texas. And they would fight in front of the children. J.L. also noted that he had heard appellant sexually assaulting the complainant in the past, i.e., before May 8, 2015. He explained that appellant "would come in late at night, and then [he and I.L. would] hear [appellant and the complainant] arguing, and then it would just lead to that." In other words, he had heard "sexual assault[s]" happening in the past, but he did not see anything because there was a divider placed between the two beds in the motel room. J.L. opined that what he had heard "didn't sound consensual" because when the complainant would say "[s]top" or "[p]lease get off of me," appellant would tell her to "[b]e quiet." (Internal quotations omitted.)

J.L. further testified that on May 15, 2015, he spoke with DFPS investigators about the May 8, 2015 assault. The trial court, without objection, admitted into evidence an audio recording of DFPS investigator Cantu's interview with J.L. In it, J.L. stated that he had been living at the Lake LBJ motel for approximately one week and he, the complainant, appellant, and I.L. had previously lived at the Hill Country Lodge motel. However, they had been kicked out of the Hill Country Lodge motel because the landlord "didn't like them" and appellant and the complainant had gotten into a fight.

8

J.L. explained that appellant and the complainant mostly fought verbally, but sometimes their fighting would get physical. For example, appellant would slap the complainant in the face with an open hand. On May 8, 2015, however, the fighting was "really bad," and appellant made the children stay to watch it. During that fight, which lasted for an hour, appellant choked the complainant "a lot." And he threw her on the floor, spit on her, and kicked her in the ribs. He would not stop hitting her.

Maxwell, who "grew up" with appellant and the complainant, testified that on May 30 or 31, 2015, he, the complainant, and Brennanan were "sitting at [his] place . . . , talking and hanging out" when appellant came to the Hill Country Lodge motel. Upon arrival, he began "knocking on the window and the door" of Maxwell's motel room and "hollering several different threats." Appellant said that "he was going to kill" the complainant and "break [Maxwell's] neck." He made "[a] lot of threats," and specifically told the complainant, "I'm going to kill you, you fucking bitch." (Internal quotations omitted.) Although Maxwell remembered that had made "lots of threats . . . towards [him] specifically, and towards [the complainant]," he could not recall whether appellant had threatened Brennanan. Maxwell, the complainant, and Brennanan all stayed in Maxwell's motel room, and during the incident, no one "made contact with [appellant]." After about ten minutes, appellant

9

entered his car and left. A law enforcement officer came to the motel afterwards because appellant had "threaten[ed]" the complainant, Maxwell, and Brennanan.

Llano County Sheriff's Office Corporal R. Van Pelt testified that on May 30, 2015, he was on patrol in the evening when he received a call "for threats" at the Hill Country Lodge motel. Upon arrival at the motel, he spoke with the complainant, Maxwell, and Brennanan because the complainant had been "threatened" by appellant. Van Pelt explained that he was unable to locate appellant after the incident.

Appellant testified that he and the complainant had lived together and he "beat[]" her. He began using methamphetamine when he was thirteen years old, and he and the complainant used it "[o]n and off" during their entire relationship, for approximately thirteen years. The complainant began living with appellant when she was fifteen and he was twenty years old. According to appellant, there had been "serious physical violence between [him] and [the complainant] in the past," and he agreed with "most . . . of what [she had] said to th[e] jury." For instance, appellant, in the past, had hit, grabbed, held, pushed, and bruised the complainant. However, he denied ever choking her.

In regard to the mid-morning assault and sexual assault on May 8, 2015, appellant stated that he had stayed at the Lake LBJ motel the night before with the complainant and the children. After waking up in the morning, he and the

complainant used methamphetamine, and they then engaged in a physical fight when he tried to leave. At the time, the children were in the motel room, and he made them stay in the room, while he "assaulted" the complainant.[7] According to appellant, the complainant did not "lie[]" when she said that he had "hit[] her" or pushed her. And he did "step on" her. However, appellant denied choking the complainant, although he could not explain why J.L. had testified that he had heard appellant choking the complainant. He did opine that "[m]aybe [J.L. had] heard [the complainant] say it."

During the assault, appellant did tell the complainant, "This is the man you want, this is the man you got," because she was always accusing him of "[b]eing violent, being rude, being aggressive, [and] being the way [that he] was acting that [day]." (Internal quotations omitted) The fight ended when appellant left the motel room around 2:00 p.m. He conceded that he was being "violent" that day and the complainant had bruises from him pushing her and him "grabb[ing] her and pick[ing] her up" to "violently" move her.

Appellant, after using narcotics at a friend's home, subsequently returned to the Lake LBJ motel late at night on May 8, 2015. The complainant had "text[ed] . . . and call[ed]" him to come back to the motel room. When he arrived,

---

[7]     Appellant specifically admitted that he assaulted the complainant on May 8, 2015 in Burnet County, Texas.

the children were asleep, and he noted that both he and the complainant were under the influence of methamphetamine. After they had spent about an hour talking, appellant and the complainant had engaged in consensual "vaginal sex." And she never told him "to stop." Afterwards, he fell asleep and left the motel room at approximately 5:00 a.m. on the morning of May 9, 2015. Appellant noted that using methamphetamine in general affected his judgment and caused him to be violent. However, he explained that he knew that the sex that he had had with the complainant was consensual because they had had sex while under the influence of methamphetamine "several times before and that's how it's been."

Appellant next saw the complainant on May 11, 2015, and they again had sex. He also stayed with her and the children in the Lake LBJ motel room the night of May 14, 2015, leaving on the morning of May 15, 2015. Appellant denied harassing the complainant after May 8, 2015 and driving "behind her and mak[ing] her feel uncomfortable."

In regard to the incident at the Hill Country Lodge motel on May 30, 2015, appellant explained that he was not "contesting" that incident, during which he was "over there screaming and hollering." He admitted that he had had a "blowup" that day and what the other witnesses had testified to in regard to that incident was "what [had] happened" and was "true." Further, the threats that he made that day were

12

most likely due to his use of methamphetamine. After the manager at the Hill Country Lodge motel asked him to leave, he complied.

Appellant further testified that in late April and early May 2015, he had a cellular telephone. And he noted that Defendant's Exhibits 4, 5, and 6, which the trial court admitted into evidence, were photographs of his cellular telephone. In regard to Defendant's Exhibit 4, he explained that it showed "thumbnails," i.e., "small picture[s] of what [a] video is or [a] picture is" on the cellular telephone. And if a person "punch[ed] or . . . type[d] that thumbnail, it[] [would] blow . . . up into the bigger picture or it[] [would] play the video." Appellant further noted that two of the thumbnails that were pictured in Defendant's Exhibit 4 were for two "video file[s]." One video recording was of him and the complainant "having sex," and the other video recording was appellant and the complainant "having oral sex." The video recordings were "[v]ery" "graphic in nature" and "sexual in nature." And, according to appellant, his attorney had "taken the[] video[]" recordings, Defendant's Exhibits 2 and 3, which the trial court admitted into evidence, from appellant's cellular telephone and "put them on a disk for the jury."

Appellant also explained, in regard to Defendant's Exhibits 2 and 3, that he had made the video recordings on his cellular telephone and the complainant knew that he was making video recordings at the time. For instance, in the video recordings, the complainant "look[ed] at [appellant] several times," and his cellular

13

telephone was "pretty close to her." Further, the video recordings show that the complainant "look[ed] at [appellant] and . . . at the phone."

Appellant noted that, while his cellular telephone had been in his possession, he had "cut" the video recordings and altered and modified them to make them smaller so that they "would fit on [his cellular telephone's] SD card," the "memory chip in the back of [his] phone." Thus, although the original video recording that appellant had made with his cellular telephone was "[a]bout 15 minutes long," Defendant's Exhibits 2 and 3 were only "part of th[at] [original] video" recording or "pieces that [he had] pulled off of the full video [recording]."

The title of the first video recording from appellant's cellular telephone, Defendant's Exhibit 2, begins with the numbers "20150511," which he explained meant that it was taken on May 11, 2015, after the date on which he was "accused of sexually assaulting [the complainant]."[8] The title of the second video recording from appellant's cellular telephone, Defendant's Exhibit 3, also begins with the numbers "20150511." And he explained that he did not alter the name of either video recording in any way. Further, appellant specifically testified that the video

---

[8]     May 11, 2015 is also the date that appellant testified was the date of his "last sexual encounter" with the complainant.

14

recordings from his cellular telephone, Defendant's Exhibits 2 and 3, were taken on May 11, 2015.[9]

Vera Mims, the assistant manager at the Hill Country Lodge motel, testified that on April 27, 2015, appellant and the complainant were "having problems." At that time, appellant, the complainant, and the children were living at the motel, and Mims saw the complainant "throwing things," which indicated that "there was a problem." The complainant also had appellant's car keys and would not give them to him so that he could leave. While appellant continued to scream at the complainant to give him his keys, the complainant entered his car and threw "things out all over the ground." And Mims then called for emergency assistance. She described the April 27, 2015 incident as a "big fight" and noted that the complainant was the aggressor, although she did not know what appellant "had done to make [the complainant] so mad."

Mims further testified that after the April 27, 2015 incident, she later saw appellant at the Hill Country Lodge motel standing in front of a motel room where the complainant had spent the night. He was "beating on the door[] and the windows [and] screaming." According to Mims, the complainant was in another tenant's motel room, appellant was "screaming at her," and the complainant "did not come

---

[9]     Appellant admitted that he had previously falsely testified that the video recordings were taken on May 8, 2015 and showed that the complainant had consented to having sex with him.

15

in contact with [appellant] at that time." During the incident, appellant "said he was going to kill" the occupants of the motel room. And Mims told him to leave the motel, and he did.

## Standard of Review

We review a trial court's ruling on the admission of evidence for an abuse of discretion. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011); *Walker v. State*, 321 S.W.3d 18, 22 (Tex. App.—Houston [1st Dist.] 2009, pet. dism'd). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). When considering a trial court's decision to admit evidence, we will not reverse the trial court's ruling unless it falls outside the "zone of reasonable disagreement." *Green v. State*, 934 S.W.2d 92, 102 (Tex. Crim. App. 1996) (internal quotations omitted). We will uphold a trial court's evidentiary ruling if it is correct on any theory of law applicable to that ruling. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

## Cellular Telephone Video Recordings

In his first, second, third, and fourth issues, appellant argues that the trial court erred in not allowing him to "play[] in open court" Defendant's Exhibits 2 and 3, two video recordings from his cellular telephone showing the complainant and him "having [purportedly consensual] sex and oral sex," because, by doing so, the trial

16

court violated his right to confrontation and "right to present a complete defense." *See* U.S. CONST. amends. VI, XIV.

Although the trial court, during appellant's testimony, admitted into evidence Defendant's Exhibits 2 and 3,[10] it denied his request to play them in "open court" during his testimony. Specifically, in regard to the publication of Defendant's Exhibits 2 and 3 to the jury, the following exchange took place:

| [Appellant's Counsel]: | . . . And publication, could we get the understanding of the publication to the jury of those exhibits, or did you just say that? |
|---|---|
| The Court: | No. . . . [Defendant's Exhibits 2 and 3 will] be available to the jury during deliberations in private. Due to the graphic nature of it, it's not going to be -- the Court won't have it shown in open court, but it can be talked about. I think that the message that is important for the defense, at least when it comes to the questioning, can come out without the viewing of it, and then the jurors will have that available to them during deliberations. |
| [Appellant's Counsel]: | Judge, I request -- I'm sensitive to the Court's concerns. These two videos, exhibits -- Defense Exhibits 2 and 3, the jury is going to have access to them, period, in the deliberation room. I had them on my iPad on [appellant]'s file, and I'm able to play them on my iPad and not show anybody who's in the audience. |

---

[10] The trial court also admitted into evidence Defendant's Exhibits 4, 5, 6, photographs of appellant's cellular telephone, showing two "thumbnails" of the two video recordings at issue.

|  | And so the Court's concern about not putting these pornographic videos out in the public I think I've addressed, but I would like the opportunity to -- when questioning my client, to be able to point out a few things on the video and I think I can do that without putting these videos -- |
|---|---|
| The Court: | I think you can do it without playing it even from your iPad. So you know those things that you want to play it. You can question [appellant] about any of those things, and then some jurors -- just like [the State] didn't want to finish watching the video yesterday, some of those juror might be convinced after two seconds. To have them subjected to sit through whatever you think is appropriate when all the information that they could ever need, at least in establishing initially what the defense needs, can be done through question and answer. . . . |
| [Appellant's Counsel]: | I'm requesting the Court to allow me to play these videos just to the jury and not to the public so that I can effectively present [appellant]'s case. |
| The Court: | No. I'm going to disagree that you can -- that you need that to effectively present his case, and it's going to be denied. |
| . . . . | |
| The Court: | Maybe we're not communicating appropriately . . . . You can ask him all the questions -- I'm not denying your ability to ask him questions. You can ask him questions about what they would see on the video, and what that means to him, and that |

18

type of thing. Those questions are available to you in front of the jury.

What's not is to sit there and have [appellant] naked with the alleged victim naked when someone may be sensitive to that and I don't want you to force that on them. They may be convinced enough by the questions. And if they're not, they will be instructed they're going to have those videos to convince themselves if that's what they need to do to get it. But we're not going to sit here in open -- you can ask all of those questions. That's the difference.

So for the record, so the record's clear from me to you, you can ask any question you want. There is nothing stopping you from asking the questions.

[Appellant's Counsel]: Well, you're preventing me from asking the questions while using the admitted exhibits in front of the jury. And it's our position that -- and we've established this -- is that that is a video of the sexual assault. And so I would like the opportunity to be able to question my witness with all the exhibits available to me. Given the sensitive nature of Defendant's Exhibit 2 and 3, I will do my best to just show the jury. I think I can effectively do so by using my portable iPad which is here in court.

So that's what I'm asking the Court to be able to do if. I'm not able to do that, it is going to, in my opinion in some -- to some degree, inhibit my ability to effectively put on evidence in front of this jury. That's my request, Judge.

19

. . . .

| | |
|---|---|
| [Appellant's Counsel]: | I assume my request is being denied; is that correct? |
| The Court: | . . . . It's denied. Every time you bring it up, it's denied. |

### Right to Confrontation

In his third and fourth issues, appellant specifically argues that because the trial court prevented him, during his testimony, from "play[ing] in open court," Defendant's Exhibits 2 and 3, the two video recordings from his cellular telephone showing the complainant and him "having [purportedly consensual] sex and oral sex," it violated his right to confrontation. *See* U.S. CONST. amend. VI.

The Confrontation Clause of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *See id.*; *see also Sohail v. State*, 264 S.W.3d 251, 258 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd) ("A defendant has a constitutional right to confront and cross-examine the witnesses against him."). The Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him and the right to conduct cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 107 S. Ct. 989, 998 (1987); *see also Crawford v. Washington*, 541 U.S. 36, 42, 124 S. Ct. 1354, 1359 (2004); *Coy v. Iowa*, 487 U.S. 1012, 1016, 108 S. Ct. 2798, 2801 (1988)

20

(Confrontation Clause "guarantees [a] defendant a face-to-face meeting with witnesses appearing before the trier of fact").  The essential purpose of the Confrontation Clause is

> to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*Woodall v. State*, 336 S.W.3d 634, 641–42 (Tex. Crim. App. 2011) (quoting *Mattox v. United States*, 156 U.S. 237, 242–43, 15 S. Ct. 337, 339 (1895)).

Initially, we note that to preserve a complaint for appellate review, a defendant must show that he made his complaint to the trial court by a timely and specific request, objection, or motion and the trial court either ruled on the defendant's request, objection, or motion, or refused to rule, and the defendant objected to that refusal.  TEX. R. APP. P. 33.1(a); *Griggs v. State*, 213 S.W.3d 923, 927 (Tex. Crim. App. 2007); *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003).  Rule 33.1 requires that a party have "stated the grounds for the ruling that [he] sought from the trial court with sufficient specificity to make the trial court aware of [his] complaint." TEX. R. APP. P. 33.1(a)(1)(A).  The rationale of rule 33.1 is that if an objection is raised before the trial court as soon as error becomes foreseeable, it may be addressed and the error possibly corrected or avoided.  *Moore v. State*, 295 S.W.3d 329, 333

21

(Tex. Crim. App. 2009); *see also Martinez v. State*, 22 S.W.3d 504, 507 (Tex. Crim. App. 2000) ("The purpose of requiring the objection is to give to the trial court or the opposing party the opportunity to correct the error or remove the basis for the objection."). Almost all error, even constitutional error, may be waived by a defendant's failure to object at trial. *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008).

Notably, a defendant waives his constitutional right to confrontation if he does not make a timely and specific objection at trial on the basis of that right. *See Davis v. State*, 313 S.W.3d 317, 347 (Tex. Crim. App. 2010); *Reyna v. State*, 168 S.W.3d 173, 179–80 (Tex. Crim. App. 2005); *see also Smith v. State*, 420 S.W.3d 207, 222 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) ("General rules of preservation must be followed to preserve error on Confrontation Clause grounds."). And when a case involves a proffer of evidence, rather than an objection, the same rationale applies. *See Reyna*, 168 S.W.3d at 179–80. In other words, a defendant must argue to the trial court that the Confrontation Clause demands admission of the evidence in order to preserve his complaint for appeal. *See Reyna*, 168 S.W.3d at 179–80; *see also Clark v. State*, 881 S.W.2d 682, 694 (Tex. Crim. App. 1994) (error not preserved where defendant did not sufficiently present to trial court claim sought to advance on appeal); *Carter v. State*, No. 01-16-00799-CR, 2017 WL 4682187, at *2–3 (Tex. App.—Houston [1st Dist.] Oct. 19, 2017, pet. ref'd) (mem. op., not

designated for publication) (Confrontation Clause complaint not preserved where defendant did not refer to Confrontation Clause as basis for admitting exhibit into evidence or questioning complainant about it). It is imperative to avoid forfeiting a complaint on appeal that a party "let the trial [court] know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the [trial court] to understand him at a time when the [court] is in the proper position to do something about it." *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) (internal quotations omitted).

Here, appellant asserts that the trial court's refusal to allow him to play, during his testimony, the two video recordings from his cellular telephone, Defendant's Exhibits 2 and 3, violated his right to confrontation. However, appellant never put the trial court on notice that he was making a Confrontation Clause argument, and he did not articulate to the trial court that the Confrontation Clause compelled publication of the exhibits to the jury. *See Reyna*, 168 S.W.3d at 179–80; *see also Reynolds v. State*, 371 S.W.3d 511, 519 n.2 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (defendant never argued questioning of witness "necessary to satisfy the mandates of the Confrontation Clause"); *Johnson v. State*, 963 S.W.2d 140, 142 (Tex. App.—Texarkana 1998, pet. ref'd) (theory of admissibility must be presented to trial court). Thus, the trial court never had an opportunity to rule upon appellant's assertion that the Confrontation Clause required publication to the jury of

Defendant's Exhibits 2 and 3. *See Reyna*, 168 S.W.3d at 179–80; *see also Clark*, 881 S.W.2d at 694; *Alfaro v. State*, 224 S.W.3d 426, 434 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (concluding trial court "never had the opportunity to rule upon th[e] rationale that [defendant] now presents on appeal" (internal quotations omitted)); *Smith*, 420 S.W.3d at 222.

Accordingly, we hold that appellant did not preserve his Confrontation Clause complaints, made in his third and fourth issues, for our review.[11] *See* TEX. R. APP. P. 33.1(a); *Davis*, 313 S.W.3d at 347 (holding Confrontation Clause complaints subject to general error-preservation requirements).

### Right to Present Complete Defense

In his first and second issues, appellant argues that because the trial court prevented him, during his testimony, from "play[ing] in open court," Defendant's Exhibits 2 and 3, two video recordings from appellant's cellular telephone showing the complainant and him "having [purportedly consensual] sex and oral sex," the

---

[11]    We note that the State argues that appellant's right of confrontation was not implicated in this case because "[a]ppellant only requested to publish the exhibits during his direct examination of . . . himself"; "[t]he right of confrontation is only invoked as to witnesses adverse to" appellant; and "[a]ppellant made no attempt to utilize the exhibits at issue as part of his cross[-]examination of any of the witnesses called by the State." *See Montoya v. State*, 65 S.W.3d 111, 114 (Tex. App.—Amarillo 2000, no pet.). However, having held that appellant failed to preserve his Confrontation Clause complaints for appellate review, we need not address this argument. *See* TEX. R. APP. P. 47.1.

court denied him his "Due Process right to present a complete defense." *See* U.S. CONST. amend. XIV.

The control of the business of the court is vested in the sound discretion of the trial judge. *Marquez v. State*, 921 S.W.2d 217, 223 (Tex. Crim. App. 1996); *see also Wheatfall v. State*, 882 S.W.2d 829, 838 (Tex. Crim. App. 1994). "[T]rial courts have broad discretion in managing the course of a trial generally." *Dang v. State*, 154 S.W.3d 616, 619 (Tex. Crim. App. 2005); *see also* TEX. R. EVID. 611; *Gonzales v. State*, 2 S.W.3d 600, 607 (Tex. App.—Texarkana 1999, pet. ref'd) ("[T]he trial judge has the inherent power to control the orderly proceedings in the courtroom . . . ."). "The trial court has the power and obligation to control the courtroom for the purposes of ascertaining the truth, promoting judicial economy, and protecting witnesses." *Allen v. State*, 232 S.W.3d 776, 780 (Tex. App.—Texarkana 2007, no pet.).

Texas Rule of Evidence 611 governs the mode and order of the examining of witnesses and the presentation of evidence. *See* TEX. R. EVID. 611. And it provides that the trial court "should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment." *Id.* 611(a). However, under rule 611, the scope of the trial court's exercise of discretion is limited to that which is

reasonable and "in the pursuit of justice as well as efficiency." *Dang*, 154 S.W.3d at 619. The trial court may not exercise its authority in such a manner as to deprive a defendant of a meaningful opportunity to present a complete defense. *Packer v. State*, 442 S.W.3d 375, 379 (Tex. App.—Dallas 2011, no pet.); *see also Gilmore v. Taylor*, 508 U.S. 333, 343, 113 S. Ct. 2112, 2118 (1993) (United States Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense" (internal quotations omitted)); *Linney v. State*, 401 S.W.3d 764, 772 (Tex. App.—Houston [14th Dist.] May 7, 2013, pet. ref'd).

Here, appellant asserts that the trial court denied him the right to present a complete defense when it prevented him, during his testimony, from "play[ing] in open court" Defendant's Exhibits 2 and 3.

A criminal defendant's constitutional right to a meaningful opportunity to present a complete defense is grounded in the Fourteenth Amendment's Due Process Clause and the Sixth Amendment. *See* U.S. CONST. amends. VI, XIV; *Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009). However, "[e]rroneous evidentiary rulings rarely rise to the level of denying the fundamental constitutional rights to present a meaningful defense." *Potier v. State*, 68 S.W.3d 657, 663 (Tex. Crim. App. 2002); *Harper v. State*, 540 S.W.3d 223, 234 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd). A trial court's exclusion of evidence may rise to the level of a constitutional violation if the ruling excludes otherwise relevant and reliable

26

evidence which "forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Wiley v. State*, 74 S.W.3d 399, 405 (Tex. Crim. App. 2002) (internal quotations omitted). The fact that a defendant was unable to present his case to the extent and in the form he desired does not rise to constitutional error if he was not prevented from presenting the substance of his defense to the jury. *Potier*, 68 S.W.3d at 666; *see also Harris v. State*, 152 S.W.3d 786, 794 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) ("A defendant's right to present relevant evidence is not unlimited, but rather subject to reasonable restrictions." (internal quotations omitted)).

Appellant's defense to the complainant's sexual-assault allegation was that he and the complainant had engaged in consensual sex on the night of May 8, 2015. To that end, he testified that on the night of May 8, 2015, he returned to the Lake LBJ motel after she had "text[ed] . . . and call[ed]" him to come back. At the time, appellant and the complainant were both under the influence of methamphetamine.

Appellant further testified that he and the complainant spent an hour talking and then engaged in consensual "vaginal sex." And she never told him "to stop." According to appellant, he knew that the sex that he had had with the complainant was consensual that night because they had had sex while under the influence of methamphetamine "several times before and that's how it's been."

Appellant also testified that he next saw the complainant on May 11, 2015 and they engaged in consensual sex. He also stayed with her and the children in the Lake LBJ motel room on the night of May 14, 2015, and he left on the morning of May 15, 2015.

Although the trial court did not allow appellant, during his testimony, to play Defendant's Exhibits 2 and 3 in open court, it did admit the exhibits into evidence and allow the jury to view the exhibits during its deliberations.[12] Further, the trial court allowed appellant's counsel to question him about the video recordings depicting the complainant and appellant "having [purportedly consensual] sex and oral sex," explaining:

> Due to the graphic nature of [the video recordings], its not going to be -- the Court won't have it shown in open court, but it can be talked about. . . . So you know those things that you want to play . . . . You can question [appellant] about any of those things . . . . You can ask him all the questions -- I'm not denying your ability to ask him questions. You can ask him questions about what they would see on the video, and what that means to him, and that type of thing. Those questions are available to you in front of the jury. . . . So for the record, so the record's clear from me to you, you can ask any question you want. There is nothing stopping you from asking the questions.

---

[12] In its charge, the trial court, in regard to the exhibits admitted into evidence at trial, instructed the jury: "You may, if you wish, examine exhibits. If you wish to examine an exhibit, the foreperson will inform the court and specifically identify the exhibit you wish to examine. Only exhibits that were admitted into evidence may be given to you for examination." *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005) (we presume jury followed instructions in jury charge).

28

In regard to Defendant's Exhibits 2 and 3, appellant testified that he made the video recordings with his cellular telephone and the complainant knew that he was making video recordings at the time. For instance, in the video recordings, the complainant "look[ed] at [appellant] several times," and his cellular telephone was "pretty close to her." And the video recordings showed that the complainant "look[ed] at [appellant] and . . . at the phone."

Additionally, appellant explained that Defendant's Exhibits 2 and 3 were part of a longer video recording, i.e., "pieces that [he had] pulled off of [a] full video [recording]," that he had "cut" in order to allow the recordings to "fit on [the] SD card" for his cellular telephone. According to appellant, Defendant's Exhibit 2 depicted him and the complainant "having sex" and Defendant's Exhibit 3 depicted the complainant and him "having oral sex." Appellant noted that the video recordings were "[v]ery" "graphic in nature" and "sexual in nature."

Further, appellant, in regard to Defendant's Exhibit 2, noted that the title of the video recording begins with the numbers "20150511," which meant that it was taken on May 11, 2015, after the date on which he was "accused of sexually assaulting [the complainant]." The title of the second video recording from appellant's cellular telephone, Defendant's Exhibit 3, also begins with the numbers "20150511." And he explained that he did not alter the name of either video recording in any way. Appellant also specifically testified that the video recordings

from his cellular telephone, Defendant's Exhibits 2 and 3, were taken on May 11, 2015.

We conclude that the trial court's decision not to allow appellant, during his testimony, to play, in open court, the video recordings from his cellular telephone, Defendant's Exhibits 2 and 3, did not prevent appellant from presenting to the jury his defense that he and the complainant had engaged in consensual sex on May 8, 2015. *See Potier*, 68 S.W.3d at 666; *see, e.g.*, *Harper*, 540 S.W.3d at 234–35 (defendant failed to show how exclusion of testimony prevented him from presenting heart of his defensive theory); *Harris*, 152 S.W.3d at 794 ("The exclusion of the videotapes simply precluded [defendant] from introducing evidence in a format that the trial court considered to be misleading and confusing. The substance of [his] argument was presented to the jury, and the exclusion of the videotapes did not prevent [him] from putting on a complete defense."); *see also Smith v. State*, No. AP-75,793, 2010 WL 3787576, at *23 (Tex. Crim. App. Sept. 29, 2010) (not designated for publication) ("The fact that [defendant] was not able to present his case in the form he desired does not amount to constitutional error when he was not prevented from presenting the substance of his defense to the jury."). Accordingly, we hold that any error by the trial court in not allowing appellant, during his testimony, to play Defendant's Exhibits 2 and 3 in open court did not amount to a denial of his right to present a complete defense. *See Potier*, 68 S.W.3d at 666.

30

We overrule appellant's first and second issues.

## Extraneous-Offense Evidence

In his fifth, sixth, seventh, and eighth issues, appellant argues that the trial court erred in admitting extraneous-offense evidence that he "repeatedly choked" the complainant and "committed [a] terroristic threat"[13] because such evidence constituted "improperly admitted character conformity evidence and was unfairly prejudicial."

### *Choking Evidence*

In his fifth issue, appellant specifically argues that the trial court erred in admitting the complainant's testimony that appellant had "choked" her in the past because such evidence constituted extraneous-offense evidence and was "improperly admitted character conformity evidence and . . . unfairly prejudicial." *See* TEX. R. EVID. 403, 404(b).

At trial, the complainant testified that prior to the mid-morning assault on May 8, 2015, appellant had, during their relationship, "choked [her] before," while they had been living together.

"An extraneous offense is any act of misconduct, whether resulting in prosecution or not, which is not shown in the charging instrument and which was

---

[13]     *See* TEX. PENAL CODE ANN. § 22.07 (Vernon Supp. 2017) (offense of terroristic threat).

31

shown to have been committed by the accused." *Martinez v. State*, 190 S.W.3d 254, 262 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). Texas Rule of Evidence 404(b) prohibits the admission of extraneous offenses to prove a person's character or to show that the person acted in conformity with that character. TEX. R. EVID. 404(b). Extraneous offenses may, however, be admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *See id.*; *Montgomery*, 810 S.W.2d at 387–88. And evidence of extraneous acts may also be admissible to rebut defensive theories. *Lane v. State*, 933 S.W.2d 504, 519 (Tex. Crim. App. 1996).

A defensive theory may be raised through voir dire, opening statements, or cross-examination. *See Dabney v. State*, 492 S.W.3d 309, 318 (Tex. Crim. App. 2016) (voir dire and opening statement); *Bass v. State*, 270 S.W.3d 557, 562–63 (Tex. Crim. App. 2008) (opening statement); *Ransom v. State*, 920 S.W.2d 288, 301 (Tex. Crim. App. 1994) (cross-examination). Relevant to the instant case, one of the recognized justifications for the admission of a defendant's extraneous offenses is to rebut the defensive theory of fabrication. *See Bass*, 270 S.W.3d at 562–63; *Donald v. State*, 542 S.W.3d 466, 482 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *Sandoval v. State*, 409 S.W.3d 259, 301 (Tex. App.–Austin 2013, no pet.).

Here, during his trial counsel's opening statement, appellant sought to advance his defensive theory that the complainant had fabricated her choking and

sexual assault allegations against him because she was at risk of having her parental rights to the children terminated in her DFPS case. In other words, she "realized that there was a chance that she would no longer have her kids and that there was a chance that her children . . . might end up with [appellant] and not with her." Thus, according to appellant, she found herself in "a dire, dire situation" and made allegations "beyond what actually happened" and which he denied.[14]

This defensive theory, first raised during appellant's opening statement, opened the door for the State to rebut his claim that the complainant had fabricated her allegations against him. And her testimony that he had, during their relationship, "choked [her] before," constituted evidence that went directly to his defensive theory and was sufficiently similar to the offense with which he was charged. *See Bass*, 270 S.W.3d at 562–63 (holding extraneous offense admissible to rebut defense claim of fabrication made during opening statement); *Gonzalez v. State*, 541 S.W.3d 306, 311–12 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (criminal complaint associated with defendant's prior conviction for assault of family member admissible to rebut defensive theory, raised during opening statement, offense never occurred); *Sandoval*, 409 S.W.3d at 301. Here, by showing that the complainant's

---

[14]   Appellant presented his defensive theory of fabrication throughout trial and testified that he did not choke the complainant on May 8, 2015, had never choked her before, and engaged in consensual sex with her on May 8, 2015. He also testified that a potential reason for J.L. to testify that he had heard appellant choking the complainant was that "[m]aybe he [had] heard [the complainant] say it."

33

choking allegation was less likely to be fabricated, the extraneous-offense evidence, i.e., her testimony, directly rebutted appellant's defensive claim and had logical relevance aside from character conformity. *See Sandoval*, 409 S.W.3d at 301. Accordingly, we hold that the trial court did not err in admitting the complainant's testimony that appellant had "choked" her in the past.

However, even when the admission of extraneous-offense evidence is permissive under rule 404(b), we must still determine whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice under rule 403. *See* TEX. R. EVID. 403; *Jabari v. State*, 273 S.W.3d 745, 752–53 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *Blackwell v. State*, 193 S.W.3d 1, 8–10 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). Rule 403 favors admissibility of relevant evidence, and the presumption is that generally relevant evidence will be more probative than unfairly prejudicial. *Montgomery*, 810 S.W.2d at 389. Therefore, the party opposing admission of the evidence bears the burden to demonstrate that the opposite is true. *Kappel v. State*, 402 S.W.3d 490, 494 (Tex. App.—Houston [14th Dist.] 2013, no pet.). We consider the following non-exclusive list of factors when conducting a rule 403 analysis: (1) the strength of the extraneous-offense evidence to make a fact of consequence more or less probable, (2) the potential of the extraneous-offense evidence to impress the jury in some irrational but indelible way, (3) the time during trial that the State requires to

34

develop evidence of the extraneous misconduct, and (4) the need of the State for the extraneous-offense evidence. *Blackwell*, 193 S.W.3d at 9; *see also Hernandez v. State*, 390 S.W.3d 310, 324 (Tex. Crim. App. 2012). We will uphold the trial court's ruling on a rule 403 balancing test, whether explicit or implied, if it is within the zone of reasonable disagreement. *Jabari*, 273 S.W.3d at 751–53.

The first factor in the rule 403 balancing analysis is the strength of the extraneous-offense evidence to make a fact of consequence more or less probable. *Blackwell*, 193 S.W.3d at 15. The complainant testified that during the mid-morning assault on May 8, 2015, appellant pushed her to the floor, got "on top" of her, put his hands around her neck and "chok[ed]" her, causing her to have difficulty breathing. According to the complainant, he did not choke her by "accident" or because of a "mistake." Similarly, J.L. testified that during the May 8, 2015 assault, he saw appellant choke the complainant while she was on the floor, appellant put his hands around her throat, and the complainant was "gasping." In his interview with DFPS investigator Cantu, which was admitted into evidence, J.L. also stated that during appellant and the complainant's fight on May 8, 2015, appellant choked the complainant "a lot."

In contrast, appellant, on direct examination, appellant specifically denied choking the complainant on May 8, 2015 and further noted that he had never choked her at any time. And when asked why J.L. would testify that he had heard appellant

choking the complainant, appellant stated: "Maybe [J.L. had] heard [the complainant] say it."

The issue of whether the complainant was telling the truth about appellant choking her on May 8, 2015 was a central issue at trial, and the main defensive theory advanced by appellant was that she had fabricated her allegations against him. Thus, evidence, such as testimony from the complainant that appellant had choked her in the past, was probative. *See Hammer v. State*, 296 S.W.3d 555, 562 (Tex. Crim. App. 2009) ("Rule 403[] should be used sparingly to exclude relevant, otherwise admissible evidence that might bear upon the credibility of either the defendant or complainant," especially in "he said, she said cases." (internal quotations omitted)); *see, e.g.*, *Reyes v. State*, No. 13-16-00603-CR, 2018 WL 1959993, at *3 (Tex. App.—Corpus Christi Apr. 26, 2016, no pet.) (mem. op., not designated for publication) (evidence probative where it rebuts defendant's defensive theory of fabrication); *Tucker v. State*, 456 S.W.3d 194, 207 (Tex. App.—San Antonio 2014, pet. ref'd) (State needed testimony because it rebutted defensive theory complainants fabricated their allegations); *Dilg v. State*, No. 07-13-00160-CR, 2014 WL 458019, at *4 (Tex. App.—Amarillo Jan. 29, 2014, no pet.) (mem. op., not designated for publication) (noting probative value of extraneous-offense evidence when "he said, she said" situation exists (internal quotations omitted)).

We next examine the extraneous-offense evidence "for its potential to impress the jury in some irrational but indelible way." *Blackwell*, 193 S.W.3d at 15. Prior to the presentment of the extraneous-offense evidence, the trial court instructed the jury:

> [Y]ou may hear evidence of other bad acts or crimes by the defendant or other folks. You are instructed that you may not consider that evidence to prove that the defendant acted in conformity therewith those prior acts in regards to what's been charged here today.
>
> You may use that evidence. It's up to you if you believe it and if it aids you in understanding motive, intent, absence of mistake, and/or lack of accident as to this case.

Similarly, the trial court, in its charge, expressly instructed the jury as follows:

> During the trial, you heard evidence that the defendant may have committed a wrongful act/s not charged in the indictment. The [S]tate offered the evidence to show the defendant's intent or knowledge or motive or lack of mistake or common scheme or lack of accident or to rebut defensive theories. You are not to consider that evidence at all unless you find, beyond a reasonable doubt, that the defendant did, in fact, commit the wrongful act/s. Those of you who believe the defendant did the wrongful act/s, if any, may consider it.
>
> Even if you do find that the defendant committed a wrongful act/s, you may consider this evidence only for the limited purpose [that the trial court] ha[s] described. To consider this evidence for any other purpose would be improper.

Instructions such as these minimize the likelihood that the jury would improperly use the extraneous-offense evidence. *See McCoy v. State*, No. 05-98-01146-CR, 2000 WL 1246455, at *4 (Tex. App.—Dallas Sept. 5, 2000, pet. ref'd) (not designated for publication). Because the jury was provided with such

37

express oral and written instructions limiting its consideration of the extraneous-offense evidence, we conclude that this factor weighs in favor of admissibility. *See Morin v. State*, No. 01-11-01086-CR, 2013 WL 4507950, at *4 (Tex. App.—Houston [1st Dist.] Aug. 22, 2013, no pet.) (mem. op., not designated for publication) (reviewing court's written and oral instructions to jury when analyzing second factor); *Blackwell*, 193 S.W.3d at 15 ("The trial court's instructions to the jury are a factor to consider in determining whether the jury considered the extraneous-offense evidence improperly . . . ."); *see also Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998) (rebuttable presumption exists juries follow trial court's instructions).

In regard to the third factor, we consider the time that the State needed to develop evidence of the extraneous offense. Here, the State asked the complainant only two questions about whether appellant had ever choked her in the past. This factor weighs in favor of admissibility. *Cf. Dennis v. State*, 178 S.W.3d 172, 181 n.2 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) ("[T]he potential for unfair prejudice occurs if the State spends an *undue amount of time* presenting the extraneous offense to the jury." (emphasis added)); *see also Morin*, 2013 WL 4507950, at *4 (considering percentage of testimony during trial related to extraneous-offense evidence); *Rickerson v. State*, 138 S.W.3d 528, 532 (Tex.

App.—Houston [14th Dist.] 2004, pet. ref'd) (noting "[o]ut of a 289-page reporter's record, th[e] testimony took up [only] twenty-three pages").

The fourth factor focuses on the State's need for the evidence and encompasses the issue of whether the extraneous-offense evidence relates to a disputed issue. *See State v. Mechler*, 153 S.W.3d 435, 441 (Tex. Crim. App. 2005). Notably, when, as here, a defendant denies committing the criminal offense or contends that the complainant fabricated the allegations against him, evidence of similar extraneous offenses may be necessary to corroborate the complainant's account and rebut the defensive theory. *See Victorian v. State*, No. 01-13-01004-CR, 2015 WL 3915966, at *7 (Tex. App.—Houston [1st Dist.] Nov. 18, 2015, pet. ref'd) (mem. op., not designated for publication); *see also Reyes*, 2018 WL 1959993, at *3; *Shimp v. State*, Nos. 11-16-00234-CR, 11-16-00235-CR, 2017 WL 6395520, at *7 (Tex. App.—Eastland Dec. 14, 2017, no pet.) (mem. op., not designated for publication) (defensive theory strengthened State's need for extraneous evidence).

Balancing all of the factors, we hold that the trial court did not err in determining that the extraneous-offense evidence, i.e., the complainant's testimony that appellant had "choked" her in the past, was not substantially more prejudicial than probative under rule 403. We further hold that the trial court did not err in admitting the complainant's testimony about a past instance of choking.

We overrule appellant's fifth issue.

***Terroristic Threat Evidence***

In his sixth, seventh, and eighth issues, appellant specifically argues that the trial court erred in admitting the testimony of the complainant, Corporal Van Pelt, and Maxwell about the May 30, 2015 incident, during which he "committed [a] terroristic threat,"[15] because such testimony constituted extraneous-offense evidence and was "improperly admitted character conformity evidence and . . . unfairly prejudicial."

The complainant testified that on May 31, 2015, while she, Maxwell, and Brennanan, Maxwell's neighbor, were all together in Maxwell's room at the Hill Country Lodge motel, appellant came to the motel. He "pull[ed] up" to the motel, "jump[ed] out of [his] car," and screamed outside the motel room window that the complainant was a "whore" and "he was going to kill [her]." After she called for emergency assistance, he "jumped back in [his] vehicle" and "took off." According to the complainant, appellant was "acting crazy at the window," "screaming at [her] that he was going to kill [her]." And two law enforcement officers came to see her later that day about the incident. Prior to the complainant's testimony, appellant objected to it based on Texas Rules of Evidence 404(b) and 403.

Corporal Van Pelt testified that on May 30, 2015, he was on patrol in the evening when he received a call "for threats" at the Hill Country Lodge motel. Upon

---

[15] *See id.*

40

arrival at the motel, he spoke with the complainant, Maxwell, and Brennanan because the complainant had been "threatened" by appellant. Van Pelt explained that he was unable to locate appellant after the incident. Appellant did not object to Van Pelt's testimony on any ground.

Maxwell testified that on May 30 or 31, 2015, the complainant and Brennanan were "sitting at [his] place . . . , talking and hanging out" when appellant came to the Hill Country Lodge motel. Upon arrival, he began "knocking on the window and the door" of Maxwell's motel room and "hollering several different threats." Appellant said that "he was going to kill" the complainant and "break [Maxwell's] neck." He made "[a] lot of threats," and specifically told the complainant, "I'm going to kill you, you fucking bitch." (Internal quotations omitted.) Although Maxwell remembered appellant had made "lots of threats . . . towards [him] specifically, and towards [the complainant]," he could not recall whether appellant had threatened Brennanan. Maxwell, the complainant, and Brennanan all stayed in Maxwell's room, and no one "made contact with [appellant]." After about ten minutes, appellant entered his car and left. A law enforcement officer came to the motel afterwards because appellant had "threaten[ed]" the complainant, Maxwell, and Brennanan. Prior to Maxwell's testimony, appellant objected to it based on Texas Rules of Evidence 404(b) and 403.

41

As an initial matter, we note that appellant did not object to Corporal Van Pelt's testimony that appellant had "threatened" the complainant on May 30, 2015 at the Hill Country Lodge motel. And we may not determine whether a trial court erred in the admission of evidence unless error is preserved for our review. *See Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003). To preserve a complaint regarding the admission of evidence for appellate review, a defendant must lodge a timely, specific objection, and that objection must comport with the defendant's complaint on appeal. *See* TEX. R. APP. P. 33.1(a); *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). A reviewing court will not consider errors, even those of constitutional magnitude, that were not called to the trial court's attention. *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995); *Rothstein v. State*, 267 S.W.3d 366, 373 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd).

Because appellant never objected to Corporal Van Pelt's testimony on the grounds that it constituted "improper . . . character conformity evidence and was unfairly prejudicial," under rules 404(b) and 403, he cannot now raise such a complaint on appeal. *See* TEX. R. APP. P. 33.1(a); *Rawlins v. State*, 521 S.W.3d 863, 870–71 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (complaint admission of evidence violated rule 404(b) not preserved where defendant did not raise rule 404(b) objection in trial court); *Lopez v. State*, 200 S.W.3d 246, 251 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) ("[A] specific rule 403 objection must be

42

raised to preserve error."). Accordingly, we hold that appellant did not preserve for our review his complaint that that the trial court erred in admitting the testimony of Van Pelt about the May 30, 2015 incident during which he "committed [a] terroristic threat."

In regard to appellant's complaint that the trial court erroneously admitted the testimony of the complainant and Maxwell regarding the terroristic threat made by him on May 30, 2015, we note that under the doctrine of curative admissibility, the admission of improper evidence cannot be asserted as grounds for reversal on appeal if the defendant offers evidence of substantially the same facts. *See Maynard v. State*, 685 S.W.2d 60, 65 (Tex. Crim. App. 1985); *Aguilar v. State*, 980 S.W.2d 824, 826 (Tex. App.—San Antonio 1998, no pet.). In other words, where a trial court erred in admitting evidence over a proper and timely objection, and a defendant thereafter presents the same kind of evidence or testimony to which he previously objected, the error is deemed to be waived or cured.[16] *Sweeten v. State*, 693 S.W.2d 454, 456 (Tex. Crim. App. 1985); *Smith v. State*, 957 S.W.2d 881, 883 (Tex. App.— Texarkana 1997, no pet.).

---

[16] We note that a defendant does not waive his right to challenge the admissibility of evidence if he sought to meet, destroy, or explain it by the introduction of rebutting evidence. *Smith v. State*, 957 S.W.2d 881, 883 (Tex. App.—Texarkana 1997, no pet.); *Rodriguez v. State*, 919 S.W.2d 136, 139 (Tex. App.—San Antonio 1995, no pet.). Such circumstances are not present in the instant case.

Here, appellant, on direct examination, testified that he was not "contesting" the May 30, 2015 incident at the Hill Country Lodge motel during which he was "screaming and hollering." He admitted that he had had a "blowup" that day and what the other witnesses had testified to was "what [had] happened" and was "true." And the threats that he made on that day were most likely due to his use of methamphetamine. *See Maynard*, 685 S.W.2d at 65 ("[W]hen the defendant offers the same evidence to which he earlier objected, he is not in a position to complain on appeal."); *Thomas v. State*, 572 S.W.2d 507, 512 (Tex. Crim. App. 1976) ("It has long been the rule . . . that the admission of improper evidence cannot be urged as grounds for reversal where the defendant gives testimony on direct examination which establishes the same facts as those objected to."); *see also Severs v. State*, 87 S.W.3d 752, 754–55 (Tex. App.—Texarkana 2002, no pet.) (defendant waived any error by admitting into evidence very evidence he objected to and sought to preclude from trial); *Smith*, 957 S.W.2d at 883 (defendant waived error by admitting "that everything said . . . was true"); *Rodriguez v. State*, 919 S.W.2d 136, 139 (Tex. App.—San Antonio 1995, no pet.) (under doctrine of curative admissibility, "waiver . . . still result[s] in such circumstances if the defendant confirms the truth of such facts or evidence").

Additionally, appellant called Mims, the assistant manager at the Hill Country Lodge motel, to testify in his defense, and she testified that she saw appellant at the

Hill Country Lodge motel standing in front of a motel room where the complainant had spent the night. He, at the time, was "beating on the door[] and the windows [and] screaming." Mims noted that the complainant was in another tenant's motel room and appellant was "screaming at her." *See Maynard*, 685 S.W.2d at 65.

Further, appellant did not object when Mims testified on cross-examination that appellant had said that he was "going to kill" the occupants of the Hill Country Lodge motel room in which the complainant was staying. *See Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004) ("An error . . . in the admission of evidence is cured where the same evidence comes in elsewhere without objection." (internal quotations omitted)); *Johnson v. State*, 803 S.W.2d 272, 290 (Tex. Crim. App. 1990). And, as previously noted, appellant did not object to the testimony of Corporal Van Pelt about his threatening of the complainant on May 30, 2015. *See Lane*, 151 S.W.3d at 193; *Johnson*, 803 S.W.2d at 290.

Accordingly, we hold that appellant waived his complaint, asserted in his sixth and eighth issues, that the trial court erred in admitting the testimony of the complainant and Maxwell about the May 30, 2015 incident, during which appellant "committed [a] terroristic threat." *See Lane*, 151 S.W.3d at 193; *Aguilar*, 980 S.W.2d at 825–26 (where defendant offered evidence regarding prior conviction and parole status through own testimony, written statement, and testimony of his mother, any error by trial court in admission of testimony regarding defendant's parole status

45

waived).  Moreover, any error in the admission of such evidence was cured.  *Fierro v. State*, 969 S.W.2d 51, 56 (Tex. App.—Austin 1998, no pet.) ("[I]f the court erroneously admits evidence, but the defendant introduces the same evidence through some other means, the error is cured.").

## Text Messages

In his ninth and tenth issues, appellant specifically argues that the trial court erred in admitting into evidence State's Exhibits 4 and 5, certain text messages "purported[ly]" sent by him, because they were not properly authenticated and "Maxwell lacked personal knowledge [that] they were authored or sent by [a]ppellant."  *See* TEX. R. EVID. 602, 901.

Maxwell testified that State's Exhibits 4 and 5 constituted text messages that he had received from appellant.  According to Maxwell, he received the text messages on his personal cellular telephone and he knew that they were sent from appellant's cellular telephone because Maxwell had appellant's name "saved in [his] contact list" on his telephone.  Thus, when Maxwell received the text messages on his cellular telephone, appellant's name and cellular telephone number appeared. Maxwell received the text messages on the evening of May 30, 2015 after the earlier incident with appellant involving the terroristic threat at the Hill Country Lodge motel.

State's Exhibit 4 shows the following text messages: "Tell your friend thats assault witg [sic] a deadly weapon. nada be enough to make sure whittney e never even kidding[.]" and "Yeah i called them.." Maxwell explained that he was "not real sure" about what the text messages meant, but he knew that Brennanan, his neighbor, had "a muzzle-loading rifle" and "some airsoft guns," which "look[ed] like pistols," although "he didn't have his weapon[s] out" during the May 30, 2015 incident.

State's Exhibit 5 also shows the text message, "Yeah i called them.." And it shows text messages stating: "[A]nd yeah were still technically married and yes after 13 years you piece of shit yeah ita worrh [sic] to me you better think real hard if its worth it ro [sic] you…." and "TELL THE WHORE TO CALL ME.. OH YEAH IM NOT WOR TH HER TIME[.]" Maxwell again explained that he was "not real sure" about the meaning of the text message "Yeah i called them.." And in regard to the remaining messages, Maxwell noted that they could potentially relate to the fact that appellant "thought that there was something going on between" the complainant and him.

Before the trial court admitted State's Exhibits 4 and 5 into evidence, appellant objected to their admission based on "lack of foundation" and "lack of personal knowledge." The trial court overruled appellant's objections.

47

As previously explained, we may not determine whether a trial court erred in the admission of evidence unless error is preserved for our review. *See Martinez*, 98 S.W.3d at 193. And to preserve a complainant that evidence was erroneously admitted evidence, a party must make a timely and specific objection and obtain a ruling from the trial court. TEX. R. APP. P. 33.1(a); *Martinez*, 98 S.W.3d at 193; *Edwards v. State*, 497 S.W.3d 147, 162 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd). A party "must be specific enough so as to 'let the trial [court] know what he wants, why he thinks himself entitled to it, and do so clearly enough for the [trial court] to understand him at a time when the trial court is in a proper position to do something about it.'" *Resendez v. State*, 306 S.W.3d 308, 313 (Tex. Crim. App. 2009) (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)). A party also fails to preserve error when the contention urged on appeal does not comport with the specific complaint made in the trial court. *See Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009); *Rothstein*, 267 S.W.3d at 373.

On appeal, appellant argues, in part, that the trial court erred in admitting into evidence State's Exhibits 4 and 5 because they were not properly authenticated. *See* TEX. R. EVID. 901. However, he did not raise his improper authentication objection in the trial court. *See* TEX. R. APP. P. 33.1(a); *Martinez*, 98 S.W.3d at 193; *Edwards*, 497 S.W.3d at 162–63; *see also Rothstein*, 267 S.W.3d at 373 ("An objection stating one legal theory may not be used to support a different legal theory on appeal.").

And although appellant objected to the admission of State's Exhibits 4 and 5 on the basis of "lack of foundation," this was too general of an objection and not specific enough to advise the trial court of his complaint that the exhibits had not been properly authenticated as required by Texas Rule of Evidence 901. *See* TEX. R. APP. P. 33.1(a); *Bird v. State*, 692 S.W.2d 65, 70 (Tex. Crim. App. 1985); *Edwards*, 497 S.W.3d at 162–64; *see also Pendley v. State*, No. 2-03-111-CR, 2004 WL 2712109, at *6 (Tex. App.—Fort Worth Nov. 24, 2004, pet. ref'd) (mem. op., not designated for publication) (defendant's objection "that the proper foundation had not been laid" for admission of videotapes "too general to apprise the trial court of his specific complaint" regarding authentication). Accordingly, we hold that appellant did not preserve for our review his improper-authentication complaint, asserted in his ninth issue, in regard to State's Exhibits 4 and 5.

Appellant, on appeal, also argues, based on Texas Rule of Evidence 602, that the trial court erred in admitting into evidence State's Exhibits 4 and 5 because there is no evidence that Maxwell "possessed personal knowledge [that] [a]ppellant [had] sent the text[] [messages]." *See* TEX. R. EVID. 602.

Texas Rule of Evidence 602 provides:

> A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony. This rule does not apply to a witness's expert testimony under [r]ule 703.

49

*See id.*

In order to assert an issue on appeal, an appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities." TEX. R. APP. P. 38.1(i). An appellant waives an issue on appeal if he does not adequately brief that issue, i.e., by not presenting supporting arguments, substantive analysis, and citation to authorities. *See id.*; *Russeau v. State*, 171 S.W.3d 871, 881 (Tex. Crim. App. 2005); *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000); *Wilson v. State*, 473 S.W.3d 889, 901 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd).

Here, appellant, in his brief, provides no argument or authority to support his assertion that rule 602 barred the trial court from admitting into evidence State's Exhibits 4 and 5. *See Watkins v. State*, 333 S.W.3d 771, 779 (Tex. App.—Waco 2010, pet. ref'd) (issue inadequately briefed where defendant, other than reference to Texas Rule of Evidence 609, provided no authority to support position); *Tufele v. State*, 130 S.W.3d 267, 270–71 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (noting defendant "cited no legal authority—other than passing references to a few Texas Rules of Evidence—to support his contention"). Instead, his brief contains only bald assertions that "there was no showing [that] Maxwell possessed personal knowledge [that] [a]ppellant [had] sent the text[] [messages]" and "the trial court abused its discretion in admitting the text messages as . . . Maxwell lacked personal

knowledge [that] they were authored or sent by [a]ppellant." *See Swearingen v. State*, 101 S.W.3d 89, 100 (Tex. Crim. App. 2003) (holding party's failure to apply law to facts in his brief waives error); *see also Jackson v. State*, No. 08-10-00320-CR, 2011 WL 6093404, at *3 (Tex. App.—El Paso Dec. 7, 2011, no pet.) (not designated for publication) ("An appellant bears the burden of discussing his issues on appeal and we have no duty or right to perform an independent review of the record and applicable law to determine whether there was error."). Accordingly, we hold that appellant has waived his rule 602 complaint, asserted in his tenth issue, regarding the admission of State's Exhibits 4 and 5 into evidence. *See* TEX. R. APP. P. 38.1(i); *Lucio v. State*, 351 S.W.3d 878, 896–97 (Tex. Crim. App. 2011) (point of error inadequately briefed "presents nothing for review").

Further, we note that even were we to conclude that the trial court erred in admitting into evidence State's Exhibits 4 and 5, appellant has not shown that he was harmed by the admission of the text-messages "purported[ly]" sent by him.

The erroneous admission of evidence constitutes non-constitutional error. *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). And non-constitutional error requires reversal only if it affects the substantial rights of the accused. *See* TEX. R. APP. P. 44.2(b); *Barshaw v. State*, 342 S.W.3d 91, 93–94 (Tex. Crim. App. 2011). "A substantial right is affected when the error had a substantial and injurious effect or

influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). We will not overturn a criminal conviction for non-constitutional error if, after examining the record, we have fair assurance that the error did not influence the jury, or had but a slight effect. *Barshaw*, 342 S.W.3d at 93–94.

We review the entire record to ascertain the effect or influence of the wrongfully admitted evidence on the verdict. *Id.* In assessing the likelihood that the jury's decision was improperly influenced, we consider the testimony and physical evidence, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Id.* at 94; *see also Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002). Error in the admission of evidence may be rendered harmless when substantially the same evidence is admitted elsewhere without objection. *See Leday v. State*, 983 S.W.2d 713, 717–18 (Tex. Crim. App. 1998); *Anderson v. State*, 717 S.W.2d 622, 628 (Tex. Crim. App. 1986).

Appellant asserts that he was harmed by the admission of State's Exhibits 4 and 5 because the "erroneously admitted [text messages] allowed the State to introduce evidence of violent character propensity." However, the text messages contained in State's Exhibits 4 and 5 are largely nonsensical, and Maxwell, himself, testified that he was "not real sure" what the messages meant. *See, e.g., Tran v.*

*State*, No. 09-14-00476-CR, 2017 WL 629481, at *9 (Tex. App.—Beaumont Feb. 15, 2017, no pet.) (mem. op., not designated for publication) (holding any error in admission of writings harmless and noting, "for the most part, the writings were incoherent"); *see also Caldwell v. State*, 696 S.W.2d 606, 607–08 (Tex. App.—Beaumont 1985, pet. ref'd) (overruling complaint trial court erred in admitting into evidence videotape recording where voices complained of were unintelligible and not relevant). Further, to the extent that the messages can be read as a threat against either the complainant or Maxwell, we note that appellant admitted on direct examination that he had threatened both the complainant and Maxwell and that he had called the complainant a "whore." *See Leday*, 983 S.W.2d at 717–18; *Anderson*, 717 S.W.2d at 628; *Johnson v. State*, 425 S.W.3d 344, 346 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see also Tran*, 2017 WL 629481, at *9 (noting other witnesses testified to similar threats from defendant, without objection). And, considering everything in the record, it is unlikely that the jury's verdict was adversely affected by any error by the trial court in admitting State's Exhibits 4 and 5, particularly because State's Exhibits 4 and 5 do not concern the mid-morning assault or the sexual assault that occurred on May 8, 2015. *See Motilla*, 78 S.W.3d at 355 ("We have determined that substantial rights are not affected by the erroneous admission of evidence if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect."

(internal quotations omitted)).  Accordingly, even were we to conclude that the trial court erred in admitting into evidence State's Exhibits 4 and 5, we would hold that any error was harmless.

## Conclusion

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Lloyd.

Do not publish.  TEX. R. APP. P. 47.2(b).